102 F.3d 1120
 46 Fed. R. Evid. Serv. 240, 10 Fla. L. Weekly
Fed. C 621
UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph E. BRAZEL, Jr., Charles Hubbard, Norman L. Burgess,
Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
Sharvonne McKINNON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Levine Justice ARCHER, a.k.a. Jamaican Joe, a.k.a. Joe,
Willie Jefferson, Marlon McNealy, a.k.a. Man,
Defendants-Appellants.
 Nos. 93-2951, 93-2987 and 93-2988.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 6, 1997.
 
 David T. Weisbrod, Tampa, FL, for Ralph E. Brazel, Jr.
 Thomas P. Fox, Tampa, FL, for Charles Hubbard.
 Marvin P. Jackson, Tampa, FL, for Norman L. Burgess.
 Darlene C. Barror, Tampa, FL, for Sharvonne McKinnon.
 Michael Stepakoff, Tampa, FL, for Levine Justice Archer.
 
 
 1
 Donald E. Horrox, Clearwater, FL, for Willie Jefferson.
 
 
 2
 Carl R. Hayes, Tampa, FL, for Marlon McNealy.
 
 
 3
 Tamra Phipps, Kathy J. Peluso, Asst. U.S. Attys., Tampa, FL, for U.S.
 
 
 4
 Appeals from the United States District Court for the Middle District of Florida.
 
 
 5
 Before TJOFLAT, Circuit Judge, and RONEY and CAMPBELL*, Senior Circuit Judges.
 
 
 6
 LEVIN H. CAMPBELL, Senior Circuit Judge.
 
 
 7
 These appeals are from the convictions of seven individuals charged with drug trafficking offenses following a jury trial that took place in the United States District Court for the Middle District of Florida, Tampa Division. Defendants-appellants Levine Archer, Ralph Brazel, Norman Burgess, Willie Jefferson, Charles Hubbard, Sharvonne McKinnon, and Marlon McNealy were allegedly all associated with an organization led by Ronald Mathis (a/k/a "Romeo" or "Rome") in St. Petersburg, Florida, that engaged in the distribution of crack cocaine. On October 23, 1991, a federal grand jury handed down drug trafficking indictments against thirty-two people including these defendants. Many of those indicted pleaded guilty and cooperated with the government, some of them later testifying against one or more of the defendants.
 
 
 8
 Defendants' trial was lengthy, beginning on February 4, 1993 and consuming approximately three months.[1] On May 7, the jury found all seven defendants-appellants guilty of conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846. Archer and McNealy were also found guilty of conspiracy to commit racketeering activities and participation in racketeering activities, 18 U.S.C. § 1962(d) & (c), and two and three counts, respectively, of possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(1). Jefferson was convicted of conspiracy to commit racketeering activities, 18 U.S.C. § 1962(d). Brazel was convicted of two counts of possession of cocaine with intent to distribute, 21 U.S.C. § 841(a). Burgess was convicted of use of a firearm during and in relation to drug trafficking, 18 U.S.C. § 924(c). Sentencing proceedings were held in August and September 1993. All the defendants received at least one life sentence. These appeals followed.
 
 
 9
 We begin this opinion with a short overview giving a general picture of the evidence at trial. Additional evidence is summarized within the ensuing, separately labelled sections of the opinion, in conjunction with our discussion of points the defendants have raised. Hence, right after the evidentiary overview, we consider the contentions of McKinnon, Hubbard, Burgess, and McNealy that the evidence was insufficient, as a matter of law, to support their convictions on certain counts; and in doing so we set out the evidence relevant to their contentions. Thereafter, we address seriatim numerous assertions of legal error the defendants individually and collectively have made.
 
 
 10
 We affirm all the convictions and sentences.
 
 I. Overview
 
 11
 Construed in the light most favorable to the government, the evidence at trial showed the following. During 1990 and 1991 in St. Petersburg, Florida, Ronald Mathis operated a major crack cocaine distribution organization with which the defendants were connected. Defendant Levine Archer ("Jamaican Joe") supplied crack cocaine to the organization during 1990 until early 1991, when he had a dispute with Mathis. Around late 1990, Marlon McNealy and Willie Jefferson became suppliers as well. They were soon joined by Charles Hubbard, and these three were principal suppliers from July 1 through October 1991.
 
 
 12
 During 1990 the Mathis organization operated on the north side of St. Petersburg. Mathis and his nephew, defendant Ralph Brazel, were among those who brought 25- and 50-packs of crack cocaine to Mathis's sellers on Grove Street, where a rock of crack cocaine sold for $20 ($1,000 for a 50-pack). Occasionally, a seller returned crack cocaine to Mathis because it was unfit to be sold, part having been cut and sold on the side. When Mathis was not home, the seller left a plastic bag containing the drugs, along with drug proceeds, with Mathis's live-in girlfriend, Sharvonne McKinnon; the seller and she emptied the bag and together counted the rocks of crack cocaine to be returned to Mathis. On July 11, 1990, St. Petersburg Police Department (SPPD) Detective Gerald Niles and a confidential informant made an undercover purchase of three rocks of crack for $60 from Brazel and another person at 615 Grove Street North. Brazel thereafter pled guilty to a state charge of selling cocaine on that date, and evidence of the plea was introduced at the instant trial.
 
 
 13
 In late 1990, Mathis moved his operations to the south side of the city. On December 24, 1990, at an organizational meeting attended by about twenty people, Mathis outlined his plan to be bigger and smarter than another drug organization in the city, run by "Wonderman" Lee, had been. McKinnon was present and added that workers should not be as flashy as the Lee organization. In 1991 the center of operations was Mathis's residence at 781 16th Avenue South, though several sites on the south side were used to prepare, sell, and pay for drugs sold. These locations included 827 Preston Avenue South, 14th Avenue South and Highland by a key shop, locations around 15th and 16th Avenue South, 1222 19th Avenue South, and 2320 Fairfield Avenue. Mathis moved operations from one site to another in response to law enforcement searches, and ordered at least one site to be burned down to impede investigation efforts. Evidence of arson and attempts at burglary and murder was introduced, indicating the full extent of the Mathis organization's activities.
 
 
 14
 On the south side, the Mathis organization operated around the clock in three shifts: midnight to 8:00 a.m., 8:00 a.m. to 5:00 p.m., and 5:00 p.m. to midnight. Each shift had a "boss," who delivered 50-packs of crack cocaine to "servers." Servers took orders from customers and made deliveries accompanied by "collectors," who took the money from the buyer and immediately counted it. "Overseers" kept tally sheets of how much crack cocaine a worker had out, collected shift revenues, and transferred the money to Mathis. "Lookouts" warned other workers of the approach of police or members of a special drug task force (the "green team," so named because of their green jackets) by shouting, using a walkie-talkie, or activating a remote-controlled siren or alarm. Firearms were purchased and carried by some workers for protection against robbery of drugs or money. Defendants Norman Burgess and Brazel held various positions on the shifts; Burgess also served as an armed guard to Mathis or one of his associates carrying money. McKinnon had no formal assignment on a shift, but on various occasions accepted and counted rocks of crack cocaine and money from shift workers, alerted Mathis and his associates to the approach or arrival of the green team, and relayed messages from shift workers to Mathis.
 
 
 15
 A rock of crack cocaine sold on the south side for $10 ($500 for a 50-pack). For each 50-pack sold, $50 went to workers on the shift and $450 was returned to Mathis, who paid the suppliers and also paid workers regularly on Fridays.
 
 
 16
 SPPD officers conducted undercover buys from Mathis workers around 14th Avenue South and Highland Street on March 22, March 25, and April 9, 1991. On the first two dates, undercover officer Marilyn Brown and a confidential informant purchased 25 and 50 rocks of crack cocaine from Ralph Brazel and others. Brazel collected the money from her each time, and, in response to her question about where she could get a one-ounce "cookie" of crack cocaine (a piece not yet cut into rocks), answered that she would have to talk to Mathis. Brazel pled guilty to state charges of sale and possession of crack cocaine on these dates. A third undercover buy was begun on April 9, 1991 at 14th Avenue and Highland Street, but was not completed. Detective Niles and a confidential informant attempted to purchase crack cocaine from Burgess and another person, but the transaction was disrupted when individuals nearby shouted "green team." Before the transaction ended, Burgess asked Niles whether he was a police officer, and, apparently believing it was all right to proceed, agreed to Niles's suggestion to put the substance appearing to be crack cocaine on the ground, where Niles would also leave the money. (The money was not in fact left, nor the substance taken.)
 
 
 17
 From June until November 1991, SPPD detectives intercepted cordless telephone conversations made to and from Mathis's residence. Local officers carried out searches of addresses associated with the Mathis organization, and conducted additional undercover drug transactions with assistance from special agents of the Federal Bureau of Investigation (FBI). The latter took place on or around July 25, August 2, and August 15 at a local Chevron station and a Burger King. On October 24, 1991, Hubbard, McNealy, and Jefferson were arrested after a search of a residence they frequented revealed drugs along with some of their belongings. On October 31, at Mathis's direction, Hubbard went with two other Mathis workers to McKinnon's apartment, where they arrived at around 1:00 a.m. and cut up and bagged 50-packs of crack cocaine until early morning. When police arrived, seeking McKinnon's cooperation in their investigation, the three who had been cutting crack escaped out the window with their supplies.
 
 II. Discussion
 A. Sufficiency of the Evidence
 
 18
 Four defendants assert that the district court erred in denying their motions for judgment of acquittal made at the close of the government's case and renewed thereafter. McKinnon, Hubbard, and Burgess argue that the government's evidence was insufficient to support their convictions of conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846. McNealy challenges his RICO conviction for conspiracy to commit racketeering activities in violation of 18 U.S.C. § 1962(d).
 
 
 19
 We review the sufficiency of the evidence de novo to determine whether a reasonable jury could have concluded that the evidence established the defendants' guilt beyond a reasonable doubt. In so doing, we view the evidence in the light most favorable to the government and make all reasonable inferences and credibility choices in the government's favor. See United States v. Lyons, 53 F.3d 1198, 1200 (11th Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 262, 133 L.Ed.2d 185, and --- U.S. ----, 116 S.Ct. 350, 133 L.Ed.2d 246 (1995).
 
 1. Conspiracy to Distribute Cocaine Base
 
 20
 To sustain a conviction for conspiracy, the government must prove beyond a reasonable doubt that a conspiracy existed, that the defendant knew of it, and that the defendant, with knowledge, voluntarily joined the conspiracy. United States v. Lopez-Ramirez, 68 F.3d 438, 440 (11th Cir.1995) (citation omitted). Here, the government had to show that an agreement existed between two or more individuals illegally to distribute cocaine base, and that each defendant knowingly and voluntarily joined or participated in the conspiracy. See Lyons, 53 F.3d at 1201. Proof could be by direct or circumstantial evidence; if circumstantial, "reasonable inferences, and not mere speculation, must support the jury's verdict." Lopez-Ramirez, 68 F.3d at 440 (citation omitted).
 
 
 21
 "Mere presence, guilty knowledge, even sympathetic observation" and close association with a coconspirator are insufficient, without more, to support a conviction for conspiracy to distribute drugs. Lyons, 53 F.3d at 1201; see also Lopez-Ramirez, 68 F.3d at 441 (citing cases). Yet such factors may raise a permissible inference of participation in a conspiracy, which the jury may consider as a "material and probative factor ... in reaching its decision." United States v. Hernandez, 896 F.2d 513, 518 (11th Cir.) (citation omitted), cert. denied, 498 U.S. 858, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990). A defendant may be culpable even if he or she played a minor role in the conspiracy, since a conspirator need not know the details of each act making up the conspiracy. See United States v. Parrado, 911 F.2d 1567, 1571 (11th Cir.1990), cert. denied, 498 U.S. 1104, 111 S.Ct. 1005, 112 L.Ed.2d 1088 (1991).
 
 
 22
 a. McKinnon
 
 
 23
 McKinnon, Mathis's live-in girlfriend for much of the conspiracy period, argues that the evidence is insufficient to sustain her conspiracy conviction as it shows at best that she was merely present during illegal drug activity or else that she merely associated with coconspirators. We do not agree. The evidence presented against her was as follows. Mark Muse testified that when he worked for Mathis in 1990 distributing drugs on the north side of the city, he occasionally returned to Mathis crack cocaine that was not fit to sell. On at least five such occasions, Mathis was not home, and Muse gave McKinnon a clear plastic bag with crack cocaine and money from the drugs that had been sold out of the 50-pack. Muse and McKinnon together took the drugs out of the bag and counted the rocks. Muse further testified that on some of these occasions and at least once in the spring of 1991, McKinnon opined that some people in the organization were not doing their jobs and should be fired or docked pay. Ronald Brinson, who also had worked on the north side, testified that when his shift's supply of crack cocaine ran out, he called Mathis for more and was sometimes told to come by Mathis's house. Mathis was not always home; on those occasions, Brinson said he told McKinnon he was there to "get some dope," and McKinnon told him to sit and wait until Mathis returned.
 
 
 24
 Brinson testified that on December 24, 1990, McKinnon attended and spoke at a meeting held by Mathis on Preston Avenue South to outline the future of his crack cocaine distribution organization. Dwayne Green also testified that McKinnon was present, recalling that she came in after the meeting had started. Mathis chaired the meeting, discussed worker shifts and benefits, and said his operation would be bigger and smarter than another drug organization in the city run by "Wonderman" Lee. McKinnon then added, according to Brinson, that "we" are not "going to be as flashy as Wonderman was in buying new cars and having, you know, Mercedes and being all flashy, showing that we got lots of money."
 
 
 25
 Witnesses testified that during 1991 when Mathis's drug distribution organization operated on the south side of the city, McKinnon played various roles, though she held no formal position on a particular shift. Green testified that McKinnon once helped to settle a dispute between Mathis and another worker about the number of 50-packs that had been delivered to Mathis's house. The worker had said there were 121 50-packs, Mathis counted 120, and McKinnon, after agreeing to a $50 bet from Mathis about who was right, counted out 121 50-packs of crack cocaine. Green further testified that on three occasions between May and September 1991 when the "morning counter" did not show up on time, he saw McKinnon count money that two workers had delivered to Mathis's house after the midnight to 8:00 a.m. shift. Green stated that, as was the practice, McKinnon counted the money for a pack ($500), took $50 off for the workers, and put the remaining $450 in the bottom drawer of a desk for Mathis.
 
 
 26
 Everol Palmer testified that when he worked as a supplier for Mathis in early 1991, Mathis was not always home to accept a delivery, so two or three times in March or April Palmer left a plastic or paper bag with McKinnon for Mathis. Palmer did not describe the contents, and McKinnon did not ask. Palmer said that he stopped this practice when a dispute arose once over how much had been delivered, and Mathis said to deliver the packs directly to him, "don't give them to my wife."
 
 
 27
 Alvin Terry testified that when he was a boss man on 19th Avenue beginning in March or April of 1991, he was responsible for calling Mathis when law enforcement officers approached so that workers on 16th Avenue could be warned. Sometimes Terry spoke to McKinnon and asked her to relay the message that the green team was approaching, and McKinnon said "okay." Mark Muse testified that "at times" McKinnon advised him where to stand on 16th Avenue. Willis Hill, who worked the midnight to 8:00 a.m. shift, testified that he heard McKinnon, along with a lookout, yell that the green team was coming down 16th Avenue on one occasion when Willis let his cousin, Ricky Hill, sell crack and Ricky got arrested. A taped telephone conversation on September 5, 1991 between McKinnon, Mathis, and an unidentified female shows that McKinnon at one point broke off and said, "Team ... team.... They fixin a come this way. They coming this way in a green car.... Let me go." Several minutes later, McKinnon told Mathis by phone, "The team got Rick.... Got him with a whole pack." Several minutes afterward, she told Mathis that she thought Rick had been caught with money too, and that the green team was still there, and "filmed your boy and everything."
 
 
 28
 Willie Culver testified that he heard McKinnon use a walkie-talkie to warn others that police were approaching. He further testified to McKinnon's association with an incident on July 27, 1991, when all-girls crew member Bibery Ladson was selling crack and the police showed up. Arriving on the scene while the police were still there, McKinnon spoke with "boss man" Willie Abernathy and then made a call on her cellular phone. Mathis arrived twenty minutes later, and Culver heard Mathis yelling at Abernathy that Ladson was supposed to have run somewhere to hide the pack and not thrown it into the car she was using. Ladson also testified to this incident, and a recorded conversation between her and another Mathis associate the evening of July 27 indicated that McKinnon had spoken to Ladson at the scene and had told her that "they ... fixin to ... try to get you ... you better leave."
 
 
 29
 Culver also testified that on August 17, 1991, his girlfriend called Mathis for him to say he would not be in to work, and McKinnon took the message, as Mathis was not home. Culver's girlfriend spoke with McKinnon against later that day; the taped conversation, which was introduced into evidence, revealed McKinnon saying that she "told [Mathis] what you said" and she thought "somebody ... replaced [Culver] for the whole night." Maurice Wilson testified that sometimes when he called Mathis to say he would be late for his shift, he asked McKinnon to relay the message, which she agreed to do. He also stated that while he was an overseer, McKinnon paged him on his beeper sometimes to say that Mathis wanted him to come over to the house.
 
 
 30
 McKinnon was a speaker in several additional taped telephone conversations introduced as evidence of the drug organization's activities during the summer and fall of 1991. On August 26, the day after a 50-pack had been missing and no one had been paid, McKinnon said to her brother, the collector the previous night: "One came up missing.... But [Culver] trying, he trying make Romeo think he paid you. I told Romeo you ain't get paid, ain't nobody getting paid because the money was short." On September 2, McKinnon told Mathis by phone that defendant Brazel needed him because "they almost finished"--Brazel then got on the phone and said he was "out" of crack cocaine. On September 3, McKinnon told Mathis by phone that the green team was nearby and had taken a cellular phone, which it would not give back without the receipt; Mathis told McKinnon where to find the receipt so that she could retrieve the phone. A couple hours later, McKinnon called Ms. Johnnie-Mae, whose house was used for Mathis's crack operations, and said, "Rome said turn your walkie talkie on.... 'Cause the team just went up 15th." On September 25, McKinnon told Mathis by phone to "hurry up" and get home because the "Team rushed" and there was chaos. On October 4, McKinnon received a call from a person identified only as "Connie" who said, "The team kicked in the door ... [o]n Fairfield," and they discussed who was there.
 
 
 31
 The evidence also showed that around midnight on October 31, 1991, McKinnon's brother, Tucker, Tory Gamage, and defendant Hubbard went at Mathis's request to McKinnon's apartment[2] to cut up crack cocaine. Tucker testified that they arrived at about 1:00 a.m., McKinnon answered the door in nightclothes, and when they came in she went into the back bedroom with her infant and closed the door. Tucker, Gamage, and Hubbard cut up crack cocaine with razor blades and bagged it in 50-packs. At about 6:00 a.m., there was a knock on the front door and McKinnon went to answer it. Tucker testified that she looked through the peephole, and without opening the door, said, "[O]h my god, the police are out there." Tucker testified that he, Hubbard, and Gamage then put the crack cocaine and razor blades into bags, climbed out the window of the second-floor apartment, and ran. Tucker further testified that McKinnon had not observed or participated in the drug activities. Police searched the apartment later that day and did not find narcotics.
 
 
 32
 From the evidence as related above, we are satisfied that a reasonable jury could find that a conspiracy to distribute cocaine base existed and that McKinnon knowingly and voluntarily participated in it. The evidence shows more than McKinnon's mere presence at the scene or her close association with Mathis without more. Her understanding of the illegal purposes of the Mathis organization could be reasonably inferred from her attendance at the meeting on December 24, 1990 at which Mathis discussed how operations would be run, and her statement, in support of his, that "we" will not be as "flashy, ... showing that we got lots of money" as another drug operation in the city had been. Her knowledge of the organization's drug distribution objectives, and her knowing and voluntary participation in these, could reasonably be inferred from the substantial evidence showing that she performed various drug-related tasks for the organization at different times. At least two witnesses testified that she counted rocks of crack cocaine during Mathis's drug operations on the north and south side. A crack cocaine supplier and a shift worker both testified that McKinnon accepted plastic or paper bags of crack cocaine from them to pass on to Mathis. A taped telephone conversation revealed that she notified Mathis when a worker needed more crack to sell on his shift. At least three times when a worker had not shown up, she was seen counting drug proceeds delivered by workers whose shift ended at 8:00 a.m., and on those occasions she followed the organization's practice of binding together $450 per 50-pack after taking out $50 for the workers. McKinnon acted, moreover, as a lookout occasionally in 1991, expressly warning others of the approach of the green team by shouting, using a walkie-talkie, or calling on a cellular phone. When police arrived on the scene--whether it was the incident involving Bibery Ladson, Ricky Hill, or another time when a cellular phone Mathis had purchased had been taken by police--the evidence showed that she promptly contacted Mathis. Taped conversations strongly suggested that she knew the purposes of the organization, knew some of its daily activities, and willingly helped to achieve its goals of distributing cocaine base for profit while avoiding detection by law enforcement authorities. This record, from the jury's perspective, plausibly showed more than mere presence during drug activities or close association with persons dealing in drugs. Cf. United States v. Villegas, 911 F.2d 623, 629-631 (11th Cir.1990) (reviewing mere presence/close association cases and reversing conviction where evidence only showed that defendant was coconspirator's brother and was present near drug transactions), cert. denied, 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991).[3]
 
 
 33
 b. Hubbard
 
 
 34
 Hubbard argues that the government proved at best that he was an "errand boy" for Jefferson and McNealy and had a buyer/seller relationship with Mathis, but not that he was a knowing, voluntary participant in an overall conspiracy to distribute drugs. The evidence showed that Hubbard, along with McNealy and Jefferson, supplied crack cocaine to Mathis in 1991 and interacted with other Mathis associates several times during that period. Dwayne Green, an overseer for Mathis who was responsible for paying the suppliers, testified that in early 1991 Hubbard and McNealy came to the key shop on 14th Avenue to pick up 133 packs of $400 ($53,200). Green gave the money to McNealy, and then Hubbard and McNealy left the key shop accompanied by defendant Burgess, who was armed with a .357 and had been directed by Mathis to walk them to their car safely. Green further testified that in the fall of 1991, Hubbard, McNealy, and Jefferson delivered 50-packs of crack cocaine to him about every three days to store in a safe in his garage for Mathis's drug distribution operations. On three occasions, Hubbard delivered 90, 180, and 186 50-packs to Green and was unable to open the safe. Mathis contacted Green by beeper to return home to help, and the first time Green entered by the garage door, Hubbard drew a gun on him before realizing who it was. The record also showed that Green purchased two guns (a 9- and a 45-milimeter) on September 1, 1991, gave them to Jefferson, and saw Jefferson give one to Hubbard and the other to McNealy. Willie Culver testified that he saw Hubbard and McNealy each carrying a 9-millimeter Glock firearm when drugs were delivered or money was picked up. Willis Hill testified that he saw Hubbard with a gun (a "tech 9") at Mathis's house.
 
 
 35
 Culver further testified that while he was working on 16th Avenue, he saw Hubbard bring a paper bag of crack cocaine to Mathis's house five or six times. McNealy was with him twice, and one of those times, they delivered 15 50-packs. Maurice Wilson similarly testified that he saw Hubbard deliver crack cocaine to Mathis's house with either McNealy or Jefferson. Hill testified that he saw Hubbard deliver to Mathis's house a brown bag which was about one-third full of 50-packs. Corbett Talbert testified that at Mathis's instruction, he once met Hubbard down the street from Mathis's house to receive a delivery from him, counted 100 50-packs, and brought it back to Mathis's house. Culver additionally testified that he saw Hubbard pick up money from locations associated with the Mathis organization eight or nine times, and saw him do the same with McNealy and Jefferson on a few occasions. Culver was permitted to testify that Hubbard threatened him five days before he testified.
 
 
 36
 Detective McConaughey, a case agent, testified that on October 17, 1991 when he was driving near Mathis's house, he noticed and started following a white Baretta rental car which began speeding down 9th Street. He identified Hubbard as the driver when they were stopped at a traffic light and the driver turned from side to side. The detective lost the car when it drove through a construction site, but found it in someone's yard a couple minutes later with the driver's door open and the keys in the ignition. The detective found a $450 money roll inside the car. An observer at the scene testified that he saw a black male with medium build and a flat top exit the driver's side and run down 50th Avenue toward 4th or 6th Street holding a package under his arm like a football. A crime scene technician and fingerprint expert testified that one of the latent prints lifted that day off the car, on the passenger's side near the fender by the trunk, identified positively with known prints of Hubbard.
 
 
 37
 On October 21, a receipt in Hubbard's name for a cellular phone from Radio Shack was found in an abandoned car, registered in Gloria or Marlon McNealy's name, on Preston Avenue South. On October 24, Hubbard, McNealy, and Jefferson were arrested following a search of 737 52nd Avenue South, where police found crack cocaine and some belongings of Hubbard. Dwayne Green testified that after the arrest, Mathis's supply of crack cocaine was low, so Mathis paid Hubbard's bond from drug proceeds and contacted a lawyer to represent him. Taped telephone conversations between Hubbard from jail and Mathis were introduced corroborating this testimony. Hubbard was released on October 31, and around midnight, went to cut up crack cocaine at McKinnon's apartment with Tucker and Gamage, whom Mathis asked to assist him. Tucker testified that Hubbard took out razor blades and four or five cookies (whole pieces) of crack from a bag and showed him and Gamage how to cut it. The three cut and bagged 50-packs until about 6:00 a.m., when the police arrived and the three escaped with the drugs out the window. Detective McConaughey testified that around 6:15 a.m., he saw Hubbard walking in an area near McKinnon's apartment. The jury heard a taped telephone conversation showing that Hubbard called Mathis at 6:48 a.m. on November 1 and said the police had come and he had hidden the drugs.
 
 
 38
 The above evidence, viewed in the light most favorable to the government, established much more than a simple buyer-seller relationship between Mathis and Hubbard. "Where the buyer's purpose is merely to buy, and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown." United States v. Beasley, 2 F.3d 1551, 1560 & n. 27 (11th Cir.1993) (citing United States v. Burroughs, 830 F.2d 1574, 1581 (11th Cir.1987), cert. denied, 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988)), cert. denied, 512 U.S. 1240, 114 S.Ct. 2751, 129 L.Ed.2d 869 (1994). Here, the jury could reasonably infer from the evidence that Hubbard understood that the large amounts of crack cocaine he was supplying to Mathis were to be distributed by others in the organization, and knowingly and voluntarily participated in that venture. Several witnesses testified that Hubbard, alone or with McNealy and/or Jefferson, repeatedly delivered hundreds of 50-packs of crack cocaine to Mathis at his house, to a shift overseer at his house for storage in his safe, or to another Mathis associate to bring to Mathis. On some such occasions he was seen carrying a gun, and the evidence showed that an overseer for Mathis's operations had purchased one that was then given to Hubbard. Hubbard picked up thousands of dollars in payment from Mathis and an overseer after the 50-packs had been sold on shifts, and on at least one occasion was accompanied to the car by one of Mathis's armed guards. See id.; Burroughs, 830 F.2d at 1581 (evidence showed "continuing course of conduct ... designed to result in the distribution of heroin," including fronting drugs to buyers and receiving payment after their distribution).
 
 
 39
 Moreover, following Hubbard's arrest on October 24, the evidence showed that Mathis was concerned that his organization's drug supplies were running low and told Hubbard he would pay his bail and arrange for a lawyer to represent him. Hubbard was released from jail in the early evening of October 31, and several hours later left from Mathis's house with two Mathis associates recruited by Mathis to help Hubbard cut up crack cocaine and bag 50-packs. The evidence plainly sustains the jury's conviction of Hubbard for conspiracy. See Ivy, 83 F.3d at 1285-1286 (rejecting defendant's buyer-seller defense and finding his activities interdependent with the larger conspiracy where they "facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole[ ]") (citation omitted).
 
 
 40
 c. Burgess
 
 
 41
 Burgess argues that the evidence was insufficient to show that he was part of the single conspiracy charged against him in the indictment, and that therefore, his convictions for conspiracy and for carrying a firearm during and in relation to the conspiracy must be reversed. The evidence presented against Burgess showed that he worked as a boss man and as an overseer on different shifts during the conspiracy period and also served as an armed guard to Mathis and others who worked with him. Mark Sheffield testified that beginning in late 1990, he and Burgess were among those who started selling crack cocaine for Mathis on 827 Preston Avenue South at 9th Street. Sheffield and Alvin Terry testified that in early 1991 Burgess worked at that location on the 5:00 p.m. shift. Terry testified that in March and April of 1991, Burgess worked with him on the 8:00 a.m. shift at 14th Avenue and Highland Street, and Culver and Pedro Reed testified that for a period Burgess worked the 5:00 p.m. shift at the same location. When Mathis set up a new drug distribution site at 1222 19th Avenue South in the late spring of 1991, Burgess worked the midnight shift there, according to Reed, Terry, and Culver, who worked the next shift and received any remaining 50-packs from Burgess. Verlenseia Dukes testified that Burgess worked as a boss man on the 5:00 p.m. shift at 15th and 16th Avenues.
 
 
 42
 Taped telephone conversations were introduced to supplement witnesses' testimony that Burgess sometimes was removed temporarily from a shift because he drank before it, in violation of Mathis's rules. On July 10, 1991, Mathis told Maurice Wilson by phone to have Verlenseia Dukes work Burgess's 5:00 p.m. shift and to tell Burgess when he came in "to come back and fill in at 12." On July 15, Burgess asked Mathis by phone when he could come back to work, and Mathis told him that people were complaining that he was acting crazy and he should get some help for his drinking problem. In two telephone conversations on July 25, one shift worker complained to two others that Mathis was probably going to give Burgess's job on the shift to Dukes instead of to her.
 
 
 43
 Several witnesses testified that Burgess carried a gun to protect Mathis or others supplying or working for him. Everol Palmer, who was a supplier for Mathis for a period, testified that one time when he picked up a money sack from the key shop, Burgess and Green escorted him out to his car. Green and Terry both testified that Burgess had a .357 gun on that occasion. Green testified that Burgess accompanied Hubbard and McNealy to their car after they had picked up at the key shop more than $50,000 in payment for crack cocaine they had supplied. Green and Sheffield testified that the day after overseer Maurice Wilson was robbed by Mathis's brother, Mathis offered Burgess and another person $1,000 apiece to "take [his brother] all the way out" and handed Burgess a .357 gun. Burgess took the gun and left with the other person on a motorcycle, but later returned to say that they had been unable to find Mathis's brother. At times Burgess also was seen carrying a .357 gun in front of Mathis's house late at night, according to Reed.
 
 
 44
 Burgess asserts, without development, that the above evidence showed multiple conspiracies but that it did not show that he was a part of the single conspiracy charged in the indictment. We disagree. In determining whether the jury could have found a single conspiracy, we consider "(1) whether a common goal existed, (2) the nature of the scheme underlying the crimes charged, and (3) the overlap of participants." United States v. Coy, 19 F.3d 629, 633 (11th Cir.) (citations omitted), cert. denied, 513 U.S. 946, 115 S.Ct. 356, 130 L.Ed.2d 310, and 513 U.S. 1006, 115 S.Ct. 525, 130 L.Ed.2d 429 and 513 U.S. 1027, 115 S.Ct. 602, 130 L.Ed.2d 513 (1994). Clearly, a common or similar goal existed: distributing crack cocaine for profit while avoiding authorities. See United States v. Jones, 913 F.2d 1552, 1561 (11th Cir.1990). The nature of the distribution scheme was similar, in that three shifts of workers with assigned or functionally equivalent positions distributed crack cocaine delivered by suppliers to Mathis, and weapons were purchased and carried to protect Mathis and others in the operation. Lastly, there was an overlap of participants in the drug selling and supplying transactions. The evidence was sufficient for a reasonable jury to believe that a single conspiracy existed and Burgess knowingly and voluntarily participated in it.
 
 
 45
 Burgess's challenge to his firearm conviction rests solely on his claim that there was no single conspiracy. As that claim fails, and as a reasonable jury could find that he carried a firearm during and in relation to the conspiracy, we uphold that conviction as well.
 
 2. RICO Conspiracy--McNealy
 
 46
 McNealy was convicted of one count of conspiracy to distribute cocaine base, and three counts of distribution of more than 50 grams of cocaine base at undercover transactions on July 25, August 2, and August 15, 1991. The conduct charged in these four counts constituted predicate crimes for separate RICO substantive and conspiracy counts of which McNealy was also convicted. Respecting the RICO conspiracy, the indictment alleged that McNealy agreed to participate in the Mathis enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).[4] McNealy now contends that the government's failure to prove a relation between the Mathis enterprise and at least two of the four above-listed predicate racketeering acts was fatal to his RICO conspiracy conviction. He argues that none of the three acts of distribution on July 25, August 2, and August 15, 1991, respectively, were shown to have been more than isolated sales, unrelated to McNealy's role as a major supplier to the Mathis organization.
 
 
 47
 The district court instructed the jury that the focus of RICO conspiracy was an unlawful agreement.[5] The jury was told that it must find
 
 
 48
 first, that two or more persons in some way or manner came to a mutual understanding to try to accomplish a common and unlawful plan, namely, to engage in a pattern of racketeering activity as charged in the Indictment. And second, that the Defendant knowingly and willfully became a member of such conspiracy. And third, that at the time the Defendant knowingly and willfully agreed to join in such conspiracy, he did so with the specific intent either to personally participate in the commission of two predicate offenses as elsewhere defined in these instructions, or that he specifically intended to otherwise participate in the affairs of the enterprise with the knowledge and intent that other members of the conspiracy would commit two or more predicate offenses as a part of a pattern of racketeering activity.
 
 
 49
 The court's instruction correctly permitted the jury to convict McNealy of RICO conspiracy if it found that he agreed to conduct or to participate in the affairs of the Mathis enterprise either by agreeing personally to commit at least two predicate acts for the required pattern of racketeering activity, or by agreeing to the overall objective and knowing that others were conspiring to participate in the same enterprise through a pattern of racketeering activity. See Starrett, 55 F.3d at 1544 (citations omitted); United States v. Valera, 845 F.2d 923, 929 (11th Cir.1988).
 
 
 50
 McNealy's RICO conspiracy conviction must, therefore, be upheld if sufficient direct or circumstantial evidence showed that he agreed on the overall objective and "must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity." Valera, 845 F.2d at 929 (citation omitted).
 
 
 51
 Apart from McNealy's three independent drug sales, the indictment charged the following predicate offenses as part of the RICO conspiracy:
 
 
 52
 act 1: McNealy, Archer, and Jefferson conspired to distribute cocaine base from November 1988 through October 1991;
 
 
 53
 act 7: Mathis knowingly possessed cocaine base with intent to distribute between July 1990 and March 1991;
 
 
 54
 act 8: Archer knowingly possessed cocaine base with intent to distribute between July and December 1990;
 
 
 55
 act 10: Archer knowingly possessed cocaine base with intent to distribute between August and November 1990;
 
 
 56
 act 18: Mathis knowingly used a communication facility, a telephone, in facilitating a drug crime on or about July 2, 1991;
 
 
 57
 act 25: Mathis and others knowingly possessed cocaine base with intent to distribute on or about August 19, 1991.
 
 
 58
 "[T]he predicate crimes of other conspirators can also serve as predicate acts for [a defendant's] RICO conviction." United States v. Gonzalez, 921 F.2d 1530, 1546 (11th Cir.), cert. denied, 502 U.S. 860, 112 S.Ct. 178, 116 L.Ed.2d 140 and 502 U.S. 827, 112 S.Ct. 96, 116 L.Ed.2d 68 (1991). Accordingly, McNealy's RICO conspiracy conviction "can properly rest on any predicate acts the evidence to which sufficiently indicates that [he] agreed." Id. at 1546 n. 24.
 
 
 59
 The evidence at trial clearly established that McNealy knew of act one, the conspiracy to distribute drugs, participated personally in it, and knew of other members of the enterprise (e.g., Jefferson) participating in the same. The evidence also gave rise to a reasonable inference that McNealy necessarily must have known of and agreed to the commission of act seven, Mathis's knowing possession of cocaine base with intent to distribute between July 1990 and March 1991. Numerous witnesses testified that McNealy began supplying the Mathis organization around late 1990 or early 1991 on Preston Avenue South, and continued to supply large quantities of cocaine frequently to Mathis through October 1991. The evidence also showed that McNealy was paid by Mathis after the crack cocaine had been sold by shift workers, a fact that gives rise to a reasonable inference that McNealy knew Mathis intended to distribute the large quantities of crack cocaine that McNealy supplied. There is also evidence to suggest that McNealy may have been aware of other predicate offenses listed in the indictment, but it need not be evaluated, see Starrett, 55 F.3d at 1548, since we find ample evidence to support a jury finding that he agreed to the overall objective of the Mathis enterprise--profiting from the distribution of cocaine base while minimizing the risk of detection--and agreed to the commission of at least two predicate acts listed in the indictment.
 
 
 60
 Accordingly, rejecting McNealy's claim of insufficient proof of his involvement, we affirm McNealy's conviction of RICO conspiracy.
 
 B. Jury Instructions
 
 61
 McKinnon and McNealy challenge the district court's refusal to give their requested instructions on the count charging a conspiracy to distribute cocaine base. For the denial of a requested jury instruction to be reversible error, a defendant must show that the instruction "(1) was a correct statement of the law; (2) was not adequately covered in the instructions given to the jury; (3) concerned an issue so substantive that its omission impaired the accused's ability to present a defense; and (4) dealt with an issue properly before the jury." Lyons, 53 F.3d at 1200.
 
 
 62
 McKinnon argues that the district court erred in refusing to give the following instruction which she requested: "One may know of and assist (even intentionally) a substantive crime without joining a conspiracy to commit the crime."[6] McKinnon says she wanted the instruction because there was no direct evidence linking her to any agreement, and the instruction would have forced the jury to consider this issue carefully. However, the court's instructions adequately covered McKinnon's rights on this score. The existence of a conspiratorial agreement may be (and most often is) proven by circumstantial evidence; a jury could reasonably infer from the evidence here that an unlawful agreement existed and that McKinnon knowingly and willingly joined the unlawful scheme. To be sure, it was the jury's responsibility to determine, on all the evidence, whether to draw that inference. The court emphasized that the elements of a conspiracy, which it correctly described, must be proven for each individual defendant beyond a reasonable doubt before she or he could be found guilty. The instructions given by the court cautioned that mere presence or association did not necessarily prove a conspiracy, and that "a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of one, does not thereby become a conspirator." The given instructions, therefore, would have required the jury to acquit McKinnon of the conspiracy charge if it found that an unlawful agreement was not proven or that she merely advanced a purpose of the conspiracy without knowledge of it.
 
 
 63
 McNealy argues that the district court erred in refusing to give his requested instruction on the buyer-seller theory of defense to a drug conspiracy charge. However, in United States v. Lively, 803 F.2d 1124 (11th Cir.1986), we held that an instruction like the one given here was sufficient, stating that it "addressed the substance of the requested [buyer-seller] instruction: without a showing of knowledge, a single, isolated act by a defendant does not by itself constitute participation in a conspiracy." Id. at 1129. We add that the evidence against McNealy on the count charging a conspiracy to distribute cocaine base plainly showed much more than a buyer-seller relationship. Cf. Beasley, 2 F.3d at 1561 (failure to instruct jury on buyer-seller relationship theory was not plain error where evidence established a continuing course of conduct designed to result in the distribution of cocaine).
 
 
 64
 Hubbard argues for the first time on appeal that the district court erred in not instructing the jury on a lesser-included offense to conspiracy to distribute cocaine base. In light of his failure to request such an instruction below or to object timely to the jury charge given, we review his claim for plain error only. As Hubbard still does not identify what lesser-included offense instruction would have been appropriate or desirable, we find no error, let alone plain error, in the instructions given.
 
 C. Statements of Nontestifying Codefendant
 
 65
 McNealy argues pursuant to Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), that his Sixth Amendment right to confrontation was violated when Larry Thomas, who was being held in custody in the same prison wing as defendant Jefferson, was allowed to testify about statements Jefferson made to him that also inculpated McNealy. In Bruton, the Supreme Court held that the admission of statements by a nontestifying codefendant that inculpated another defendant in a joint trial violated the defendant's Sixth Amendment right to confrontation. Even where the jury was instructed to consider the statements only against the nontestifying codefendant, a substantial risk remained that the jury looked to the extrajudicial incriminating statements to determine the other defendant's guilt. See id. at 126, 88 S.Ct. at 1622-23. No Bruton problem exists, however, where the statement "was not incriminating on its face, and became so only when linked with evidence introduced later at trial." Richardson v. Marsh, 481 U.S. 200, 208, 107 S.Ct. 1702, 1707, 95 L.Ed.2d 176 (1987); United States v. Arias, 984 F.2d 1139, 1142 (11th Cir.), cert. denied, 508 U.S. 979, 113 S.Ct. 2979, 125 L.Ed.2d 676 and 509 U.S. 932, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993). Thus, "[f]or Bruton to apply, a codefendant's statement must be clearly inculpatory standing alone." Arias, 984 F.2d at 1142 (citation omitted).
 
 
 66
 McNealy challenges two aspects of Thomas's testimony. First, Thomas testified that Jefferson told him "he [Jefferson] was getting rid of five birds a week with Romeo Mathis." Thomas understood from experience that "birds" meant "[k]ilos of cocaine." Contrary to McNealy's contention, nothing in this statement or the few statements that followed on the same subject, standing alone, directly inculpated him. See Arias, 984 F.2d at 1142-1143. The statement referred solely to Jefferson in connection with the Mathis operation. Moreover, the district court instructed the jury that this part of Thomas's testimony was to be considered solely against Jefferson. See Marsh, 481 U.S. at 210, 107 S.Ct. at 1708-09 (no Bruton problem where codefendant's confession was redacted to omit any reference to defendant and limiting instruction was given). We hold that the admission of this statement did not violate McNealy's Sixth Amendment right to confrontation.
 
 
 67
 The second statement presents a more troublesome question. Thomas testified that Jefferson said that "he [Jefferson] met a couple guys at a Burger King and made a deal with them for some drugs and the guys turned out to be police detectives," and that Jefferson said McNealy was with him at the deal. The event referenced was an undercover drug transaction on August 15, 1991, in which a confidential informant and FBI special agent arranged to meet McNealy at a local Burger King to purchase crack cocaine for $1,950. Jefferson did not testify at trial, and his alleged statement testified to by Thomas directly linked McNealy to the drug deal on August 15. McNealy's name was not redacted from the statement, nor was an instruction given directing the jury to consider the statement solely against Jefferson.[7] The government concedes that this inculpatory statement creates a Bruton problem, violating McNealy's rights under the Confrontation Clause of the Sixth Amendment. See United States v. Perez-Garcia, 904 F.2d 1534, 1542-43 (11th Cir.1990) (holding that "the potentially inculpatory inference combined with the lack of a cautionary instruction constituted a violation of appellants' rights under Bruton and the confrontation clause," though the violation did not rise to the level of plain error).
 
 
 68
 McNealy did not, however, object at trial to the admission of Thomas's testimony nor did he ask the court to give a cautionary instruction. We, therefore, review the Confrontation Clause violation for plain error only. Plain error exists "when an error is so obvious that failure to notice it would result in a miscarriage of justice." Id. McNealy argues that the admission of Jefferson's statement directly linking him to the August 15th drug transaction substantially influenced the outcome of the trial. Viewing this statement in light of all the evidence presented at trial, however, id. at 1543, we think it added little if anything more to the government's case. The jury heard testimony about the August 15th transaction from the confidential informant and FBI special agent who conducted it undercover, and both identified McNealy as the one through whom all arrangements were made and carried out. The jury saw a videotape of this and other similarly conducted undercover drug transactions with McNealy. Because there was abundant properly admitted evidence linking McNealy to the drug transaction on August 15, we do not find plain error in the court's admission of the testimony about Jefferson's statement nor in the court's failure, unrequested, to instruct the jury to consider the statement only against Jefferson. See id. at 1543; cf. United States v. Veltmann, 6 F.3d 1483, 1501 (11th Cir.1993) (Bruton violation was harmful error where, after the admission of certain evidence was reversed, "the properly admitted evidence of guilt is less than overwhelming, and the prejudicial effect of the codefendant's statements is so significant in comparison"); United States v. Hemelryck, 945 F.2d 1493, 1502-03 (11th Cir.1991) (where admission of nontestifying defendant's statement was error, and government directly linked statement to defendant in its rebuttal closing, error was harmless in light of substantial independent evidence establishing defendant's role in cocaine transaction).
 
 
 69
 D. Dismissal of Two Counts Without Jefferson's Consent
 
 
 70
 Jefferson contends that he was deprived of his right to a fair trial when the prosecution successfully moved, two days before the end of its case-in-chief, to dismiss counts two (RICO) and thirty-one (distribution of cocaine base) against him without his consent.[8] The prosecution made the motion after it says it acquired a reasonable doubt about the validity of its charges against Jefferson that he took part in a drug deal at a Burger King on August 15, 1991. Jefferson argues, as he did in the district court, that the dismissal of the two counts without his consent violated Fed.R.Crim.P. 48(a)[9] and caused prejudice to him by impairing his ability to impeach the credibility of one witness, Thomas, who testified to his participation in that incident and the remaining crimes--RICO conspiracy and conspiracy to distribute cocaine base--of which he was found guilty. Moreover, since that witness cooperated with the government, Jefferson wished to use a more forceful impeachment of him to cast doubt on the veracity of all cooperating witnesses who testified against him on the remaining charges. This prejudice was compounded, he says, by the district court's refusal adequately to explain to the jury the reason for the sudden dismissal of counts two and thirty-one.
 
 1. Dismissal of Counts Two and Thirty-One
 
 71
 Federal Rule of Criminal Procedure 48(a) requires the United States Attorney to obtain leave of court and the defendant's consent before filing a dismissal of an indictment during a trial.[10] It is undisputed that the court, on motion of the prosecution, ordered the dismissal of the two counts during trial and without Jefferson's consent.[11] Jefferson contends that the court's action violated Rule 48(a) and severely prejudiced him, warranting a reversal of his convictions under the remaining counts. We find, however, insufficient prejudice to warrant reversing or vacating Jefferson's convictions.
 
 
 72
 Conversations between the district court and counsel appearing in the record show that the court viewed its dismissal of these two counts as likely to be covered by Fed.R.Crim.P. 29(a), despite the requirements of Rule 48(a). Rule 29(a) authorizes a district court to grant a judgment of acquittal on its own motion or upon a defendant's request "after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."
 
 
 73
 Before approving the dismissal, the court asked Jefferson's counsel whether he intended to move for a judgment of acquittal on all counts pursuant to Rule 29 at the conclusion of the government's case if the asked-for dismissal of the two counts were to be denied. Jefferson's counsel replied, "I'm sure I will," but pointed out that the court would have the problem "of having to, as a matter of law, judge the credibility of three eyewitnesses to the incident." In other words, Jefferson's counsel questioned whether the court could allow his motion for judgment of acquittal on the two counts, since, no matter how untrustworthy the government's witnesses, they had testified to Jefferson's involvement in the matters charged in those counts, raising jury issues of fact and credibility beyond the court's power to resolve as a matter of law on a Rule 29 motion for judgment of acquittal. See United States v. Brown, 587 F.2d 187, 190 (5th Cir.1979) (citations omitted).
 
 
 74
 At this point, government counsel spoke up, insisting that in fact the court would be able to allow the Rule 29 motion since, as the prosecution now entertained a reasonable doubt as to the charges relating to the Burger King incident, it would move to strike its evidence against Jefferson under counts two and thirty-one.[12] Once the government did this, with the court's approval, there would exist no evidence to support the two counts, and the court would be obliged to allow Jefferson's Rule 29 motion and to dismiss both counts. Indeed, the court might do this upon its own motion sua sponte if Jefferson, contrary to counsel's representations, failed to make a Rule 29 motion.
 
 
 75
 Following this colloquy and an opportunity for defense counsel to confer with each other and to voice their concerns, the district court allowed the dismissal of the two counts against Jefferson. It explained:
 
 
 76
 The Court believes that, based upon the good-faith representation of the Government and in the interest of justice, they have, in essence, said that the Government believes that there exists a reasonable doubt regarding the charges contained in count thirty-one of the superseding Indictment, and count two of the superseding Indictment, as well as racketeering act twenty-four involving the Defendant Willie Jefferson.
 
 
 77
 If a Rule 29 motion were to be made by the Defendant or, ... if the Government were to move to dismiss at the conclusion of the Government's case in chief, or in view of this motion to strike having been made by the Government, the Court on its own motion determined that the interest of justice required the dismissal of counts two and thirty-four [sic] and racketeering act twenty-four as it relates to Willie Jefferson, it would be the Court's obligation to do so and to take those matters away from the Jury's consideration. I believe the Court has an obligation to do that.
 
 
 78
 The timing of it should be at the first moment, I believe, that the Court becomes aware of it or that the Court is asked to make a determination relative to it. That moment has arisen with the Government's motion to strike, which this Court grants.... Further, this Court believes that an appropriate instruction should be given to the Jury relative to the matters that flow therefrom.
 
 
 79
 We need not decide whether, strictly speaking, the district court's reliance on Rule 29(a) was appropriate in dismissing the two charges when it did. Certainly, its action at the time was not in accordance with the plain language of either Rule 48(a) or Rule 29(a). It should better have waited until the close of the government's evidence to let events develop.[13] Nevertheless, the effect of its prematurity upon Jefferson's defense strategy was nil, since the government's motion to strike the evidence of its witnesses against Jefferson could and certainly would have been allowed and dismissal under Rule 29(a) at the end of the prosecution's case two days later, then properly allowed by the court, either upon Jefferson's motion or sua sponte.
 
 
 80
 This is not a case where the court entered a Rule 29 judgment of acquittal based on some improper ground such as the "interests of justice." See United States v. Varkonyi, 611 F.2d 84, 86 (5th Cir.) (per curiam), cert. denied, 446 U.S. 945, 100 S.Ct. 2173, 64 L.Ed.2d 801 (1980); Brown, 587 F.2d at 190-91 (trial judge lacks authority to enter a judgment of acquittal "simply because he thinks that course would be most consonant with the interests of justice[ ]") (citation omitted). Rather, the court correctly determined that, upon its allowance of the government's striking of all evidence against Jefferson on the two counts, there would be no evidence left in support of them. We are unwilling in these circumstances to construe Rule 48(a) as broadly preventing the government from paving the way for a Rule 29(a) dismissal by withdrawing in good faith unreliable evidence against a defendant with the court's consent. The situation might be different were a defendant unequivocally to insist on his right to secure the jury's verdict on the questionable charges, see Fed.R.Crim.P. 48(a), advisory committee note 4. Here, however, Jefferson inconsistently indicated his own intention to move under Rule 29 at the close of the government's case-in-chief.
 
 
 81
 Looking, moreover, at the probable effect of Jefferson's strategy, we see little likelihood that it would have resulted in Jefferson's acquittal of the remaining RICO conspiracy and drug conspiracy counts. Jefferson was able, after dismissal of the two counts in question, to argue--as he did in counsel's closing argumentthat the only reasonable inference from dismissal of the two counts was that "Mr. Jefferson clearly and undeniably was misidentified" as being involved in those two dismissed crimes. Counsel developed support for this argument from a codefendant's cross-examination of Detective McConaughey, the SPPD case agent, who flatly admitted that he had misidentified Jefferson on August 15th in relation to the drug deal at a Burger King, and that Charles Scott, Detective Tapia, FBI Special Agent Bryant, and Larry Thomas had testified to the same incident (i.e., by inference, had also misidentified Jefferson).
 
 
 82
 Furthermore, Jefferson's guilt of the RICO conspiracy and drug conspiracy charges was the subject of a very considerable body of evidence from witnesses who did not place Jefferson at the August 15th Burger King incident and could not, therefore, be impeached because of any misidentification occurring then. Larry Thomas was the only witness to the stricken Burger King episode on August 15th who gave significant other testimony against Jefferson. Many other witnesses and pieces of evidence were presented attesting to Jefferson's guilt.
 
 
 83
 We conclude that the court's dismissal of counts two and thirty-one did not amount to reversible error. Cf. Woodring, 311 F.2d at 423 (where district court dismissed one count without defendant's consent before submitting case to the jury, no prejudice resulted where evidence was insufficient to support the count and defendant had moved for a judgment of acquittal on the count at the close of the government's case but court had reserved ruling at that time).
 
 
 84
 2. Jury Instructions on the Dismissed Counts
 
 
 85
 Following the dismissal of the two counts during trial and again before the jury commenced deliberations, the district court instructed the jury at the prosecution's request that counts two and thirty-one against Jefferson and racketeering act twenty-four
 
 
 86
 have been disposed of.... You should not guess about or concern yourselves with the reason for this disposition other than that which I said to you, the good-faith professional representation by the Government. You're not to consider this fact when deciding whether the Defendant Jefferson committed the remaining crimes with which he is charged or when deciding whether the other co-Defendants committed any of the crimes with which they are charged.
 
 
 87
 The court further instructed the jury not to consider against Jefferson the testimony and evidence provided by Scott, Bryant, and Tapia, and that of Thomas as to the racketeering charges.
 
 
 88
 Jefferson objected to the instruction before it was first given to the jury. He argued that the instruction was too sanitized; the jury should be told that the dismissal resulted from the government's misidentification of him, and he risked being prejudiced if the jury could speculate about the reason for the dismissal. He said this last concern stemmed from the fact that the jury had been instructed about a month earlier not to speculate about why one codefendant was no longer present at trial, only to learn later when he testified that he had entered a guilty plea. Jefferson argued that, absent some explanation of the dismissal, the jury might think that he had agreed to a plea on those counts.
 
 
 89
 The refusal to give a requested instruction to the jury is reversible error only if "the rejected instruction was substantively correct, the actual charge to the jury did not substantially cover the proposed instruction, and the failure to give the request substantially impaired the defendant's ability to present an effective defense." United States v. Martinez, 83 F.3d 371, 376 (11th Cir.1996) (citation omitted). The court may well have felt it both incorrect and unfair to the government to announce unequivocally that Jefferson had been misidentified at the Burger King, the government having conceded only that it was now uncertain about the identification. But even assuming for purposes of argument that the requested instruction on misidentification would have been correct, we do not believe the failure to give it substantially impaired Jefferson's defense on the remaining two counts. The district court's more cryptic reason for the dismissal--the good-faith professional representation of the government--was accurate as far as it went. The court ordered the jury not to concern itself with the reasons for the dismissal beyond what had been stated when evaluating the remaining charges against Jefferson or the other defendants, and not to consider the evidence against Jefferson on the two dismissed counts. We presume the jury followed the trial court's instructions, e.g. United States v. Brown, 983 F.2d 201, 202-03 (11th Cir.1993) (citations omitted). Jefferson maintains that the failure to instruct the jury that the dismissal was due to a misidentification prejudiced him, because he was unable to present witnesses thereafter to establish a misidentification defense. As noted, however, a codefendant's counsel secured Detective McConaughey's admission that he had misidentified Jefferson as being involved in the Burger King incident on August 15th and that Charles Scott, Detective Tapia, FBI Special Agent Bryant, and Larry Thomas had also testified--by inference, wrongly--about the same incident. Thereafter, Jefferson made much of the dismissal and misidentification issues at closing argument. It is most unlikely that, by analogy to the earlier, different situation involving a former codefendant who entered a plea during trial, the jury construed the dismissal of counts two and thirty-one to mean that Jefferson had pled guilty to them. Jefferson's situation was different from his former codefendant's, Jefferson having remained on trial and having argued, with support from McConaughey's concession, that the witnesses who testified to his involvement in the Burger King incident had misidentified him. We conclude that the court's refusal to give the instruction Jefferson requested was not reversible error.
 
 3. Defense of Misidentification
 
 90
 Jefferson argues that he was deprived of a fair trial when he was prevented from presenting crucial misidentification evidence relating to the Burger King incident. The record shows that he sought unsuccessfully to introduce surveillance photographs, photographs of himself, and enlargements of the same, and also to discover which police officers conducted the surveillance relating to the Burger King incident and took the photographs. If such evidence had been admitted, Jefferson says he would have been able more effectively to impeach Thomas on other admissions that Jefferson allegedly made in custody (aside from the August 15th incident) and to impeach numerous other witnesses who, like Thomas, entered pleas and agreed to cooperate with the government.
 
 
 91
 A district court generally has broad discretion in ruling upon the admissibility of evidence, but this discretion "does not extend to the exclusion of crucial relevant evidence necessary to establish a valid defense." United States v. Williams, 954 F.2d 668, 671 (11th Cir.1992) (citations omitted). Here, the photographs were not allowed because of objections by codefendants Hubbard and McNealy and by the prosecution. The two codefendants objected that the surveillance photographs were highly prejudicial because they contained individuals who resembled themselves. The prosecutor added that if the photographs were introduced, they would open the door to showing criminal association of those codefendants at that time, and he would very likely make such an argument on rebuttal. The court sustained these objections, presumably on the grounds of Fed.R.Evid. 403, which allows the exclusion of evidence whose probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."
 
 
 92
 Balancing the serious concerns of undue prejudice raised by codefendants Hubbard and McNealy against the fact that this evidence was no longer directly relevant to Jefferson's defense--the counts based on allegations of his participation in the Burger King incident having been dismissed--we see no abuse of discretion in the district court's ruling. While further evidence of a misidentification might have aided Jefferson in impeaching Thomas's testimony as to other alleged admissions by Jefferson in custody, Jefferson raised the matter of misidentification during cross-examination of Thomas, Thomas's testimony against Jefferson as to the Burger King incident was struck from the jury's consideration, the jury heard Detective McConaughey later admit to having misidentified Jefferson as being involved in the August 15th drug deal, and the misidentification point was argued to the jury. These circumstances, as well as the ample opportunity Jefferson had to impeach Thomas on several other grounds, leads us to conclude that Jefferson's ability to impeach Thomas was not so undermined by the exclusion of misidentification evidence as to have deprived him of a fair trial. Moreover, we are not persuaded by the argument that the enhanced impeachment of Thomas with misidentification evidence about the Burger King transaction itself would have led the jury to be more skeptical about the testimony of all cooperating witnesses. We conclude that Jefferson has not established that he was denied a fair trial.
 
 E. Jefferson's Motion to Suppress Evidence
 
 93
 Jefferson contends that the district court erred in denying his motion to suppress evidence seized during a warrantless search of his Buick, which was parked outside the residence of his girlfriend, Debbie Tucker, at 5121 9th Street South. The seizure and search occurred on October 24, 1991. Earlier that day officers had arrested Jefferson and found cocaine base during a search pursuant to a warrant at 737 52nd Avenue South (an address he and other codefendants frequented). The evidence seized from the Buick included a note pad and boxes of new razor blades, similar to blades that had been seized with cocaine residue on them from the garbage outside of 737 52nd Avenue South during another search two weeks earlier.
 
 
 94
 Jefferson argues that neither probable cause nor exigent circumstances existed to justify the warrantless search. See United States v. Alexander, 835 F.2d 1406, 1409 (11th Cir.1988). The district court found probable cause, because the totality of circumstances known to Detectives Cooke and McConaughey at the time of the seizure indicated that the car was used to facilitate drug offenses and the purchaser (Gloria McNealy, said to be defendant McNealy's aunt) had no legitimate source of income to have acquired it with cash. The factual findings supporting the district court's denial of the motion to suppress are reviewed for clear error, while the court's application of the law to the facts is reviewed de novo. United States v. Wilson, 894 F.2d 1245, 1254 (11th Cir.), cert. denied, 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990).
 
 
 95
 Construed in the light most favorable to the government, id., the evidence adduced at the suppression hearing supports the district court's findings. Detective McConaughey testified that prior to the search of the car, he had obtained records showing that Ms. McNealy had paid for it with $6663.21 in cash on September 30, 1991--a time when she had minimal income,[14] leading the detectives to doubt she was the true purchaser. Detective Cooke testified that he personally saw Jefferson driving the Buick at least once in early October; that he had seen the car several times that month at 3010 11th Avenue North (a site under surveillance in this investigation); that Jefferson and Marlon McNealy together had been involved in a drug transaction with an undercover officer in August 1991; that surveillance photos showed that Jefferson, McNealy, and another codefendant frequented 737 52nd Avenue South, where a search of the garbage placed at curbside on October 8, 1991 had revealed plastic bags with powdery cocaine, tally sheets, and razor blades and containers with razor blades in them (blades that the detective knew from experience were used to cut crack cocaine into pieces). Cooke testified that he had never personally observed cocaine base or a firearm in the car and had no evidence that it was ever used to transport cocaine. He further testified, however, that before seizing the Buick, he observed through the tinted windows straight single-edged razor blades which resembled those earlier seized in the search of garbage at 737 52nd Avenue South. The district court, resolving issues of credibility in the officers' favor, found that the purchaser had insufficient income to support a cash payment for the car, and that Cooke had observed before entering the car razor blades similar to those previously found with cocaine residue on them in the search of garbage outside an address that surveillance photos showed Jefferson to have frequented. These factual findings were not clearly erroneous. Under the totality of the circumstances, including the evidence that Jefferson was seen driving the car, we are satisfied that probable cause existed at the time of the search to believe that the Buick contained some evidence of drug trafficking activities. See Wilson, 894 F.2d at 1254-55.
 
 
 96
 The district court also found that the potential mobility of the car satisfied the exigency requirement. Jefferson argues that this threat of mobility was nonexistent: he had one set of keys and was in custody at the time of the search; the officers obtained a second set of keys from his girlfriend at the private residence where the car was parked; and accordingly any exigency was created by law enforcement agents themselves. The government responds that the vehicle's inherent potential for mobility created an exigency justifying the warrantless search. E.g., Alexander, 835 F.2d at 1409 ("the ability of a vehicle to become mobile is sufficient to satisfy the exigency requirement," and "[t]he vehicle does not have to be moving at the moment when the police obtain probable cause to search[ ]") (citations omitted). We agree. No evidence was presented as to whether Jefferson's and his girlfriend's sets of keys were the only keys to the vehicle, or how many keys existed. Title to the Buick was in another person's name; Jefferson was not the only one to have been seen driving the vehicle; other codefendants were not yet in custody; and there was presumably a chance that someone (either coconspirators or his girlfriend) might remove incriminating evidence from the vehicle. See United States v. Forker, 928 F.2d 365, 369 (11th Cir.1991) (finding exigent circumstances where all suspected coconspirators had not yet been apprehended, officers did not know how many sets of keys to the vehicle existed, and officers were uncertain about whether the vehicle would remain in the parking lot); Alexander, 835 F.2d at 1410 (finding exigency existed to search stationary vehicle where government argued that "because the car was not registered in [defendant's] name, the true owner could have driven it away, thus depriving the government of evidence," and that another friend or family member "might have ... sought to destroy evidence in the car if it was not searched immediately[ ]") (footnote omitted). The district court properly denied Jefferson's motion to suppress this evidence.
 
 F. Brazel's Motion to Suppress Evidence
 
 97
 Brazel argues that two pieces of evidence--a parking ticket in his name and a tally sheet with names and numbers written by him--should have been suppressed, because they were unlawfully seized without a warrant from his apartment pursuant to invalid consent by the landlord.[15] The seizure took place on November 4, 1991, three days after Brazel's arrest and while he was in custody.
 
 
 98
 The government argues, as it did below, that Brazel lacks standing to challenge this search, because he has not carried his burden of showing a "legitimate expectation of privacy" in the area searched. United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir.1984) (citing Rakas v. Illinois, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (1978)). The district court did not rule on this ground, instead deciding that the police officer had an objectively reasonable good-faith belief that the apartment was vacant at the time and that he had obtained valid consent from the landlord to search the area. We agree with the district court's ruling, although we also believe that Brazel lacked standing to challenge the search in any case.
 
 
 99
 To have standing, a defendant bears the burden of showing a legitimate expectation of privacy in the area searched, although the government has the burden of showing "abandonment" of the premises. United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir.1994). Brazel cited no evidence in his motion to suppress and presented none at the hearing to show that he was the tenant or had an unrestricted right of occupancy or control in the apartment at the time of the search on November 4, 1991. The landlord/co-owner of the apartment building--an attorney who also had done some legal work in the past for Mathis--testified that the apartment was leased to Mathis on a month-to-month oral lease and that Mathis paid the rent. The landlord stated that the last rent was paid on October 7, and that he did not know whether that was for September or October, as he was not aware that any regular rent-payment schedule had been established. No rent was paid for November.
 
 
 100
 Defense counsel's only reference to evidence supporting Brazel's legitimate expectation of privacy in the apartment was to testimony given at trial by Sabrina or Derek Brown, former codefendants who cooperated with the government. Both referred to the searched premises as "Brazel's apartment" for some period of the conspiracy (including around the date of a shootout on October 16, 1991), but neither testified that Brazel was the tenant or lived there regularly around the time of the search on November 4. In fact, Derek Brown testified that Brazel lived with his grandmother in the house next to Mathis's for some period of time, and the police found and arrested him there on November 1, 1991. Given especially the landlord's testimony that Mathis, not Brazel, leased the apartment and paid the rent, and the uncertainty as to when Brazel lived there, we are not persuaded that Brazel carried his burden of showing a legitimate expectation of privacy in the apartment on November 4, 1991, the time of the search.[16] Cf. Baron-Mantilla, 743 F.2d at 870 (defendant's possession of a key was insufficient to show a legitimate expectation of privacy in the premises, where government proved he did not own or rent them and defendant's own testimony was not credible).
 
 
 101
 In addition to Brazel's lack of standing, further justification for the court's refusal to suppress lies in the fact that the officer seizing the evidence had an objectively reasonable good-faith belief that the premises were vacant and that he had obtained valid consent for the search from the landlord. While a landlord generally lacks common authority to consent to a search of a tenant's apartment, Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), a tenant who abandons the property loses any reasonable expectation of privacy he once had, Abel v. United States, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960). A third party's consent to search an area is valid if he has mutual use of it, with joint access to or control of the area for most purposes. United States v. Matlock, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974). And even if the consenting party does not, in fact, have the requisite relationship to the premises, there is no Fourth Amendment violation if an officer has an objectively reasonable, though mistaken, good-faith belief that the consent he has obtained valid consent to search the area. Illinois v. Rodriguez, 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990).
 
 
 102
 Detective McConaughey, who conducted the search, testified that he contacted the owner on November 4, 1991 and obtained consent to search the premises. Both the detective and the owner testified that they thought the premises were vacant.[17] The detective further testified that at the time of the search, he thought Brazel had been living with his grandmother, where he was found and arrested on November 1. The detective participated in that arrest, and knew that Brazel and Mathis were being held in custody since their arrests. The landlord testified that he could not remember why he thought the apartment was vacant; he did not recall whether he knew about Brazel's arrest at the time, but did know by the time of the search of the arrest of Mathis, who had leased the apartment and paid the rent. Both the detective and the landlord testified that if the apartment was found to be locked, the landlord had authorized the detective to contact a locksmith or get the key from a man fixing the roof that day (the detective did the latter).
 
 
 103
 Whether or not correct, we believe that the officer's belief that the premises were vacant was "objectively reasonable" on the facts provided to him, which were consistent with his own knowledge about the case. See United States v. Sledge, 650 F.2d 1075, 1079 (9th Cir.1981) (law enforcement agent had objectively reasonable good-faith belief that premises were abandoned when landlord, based on direct observation, told him that they were and this was consistent with agent's own observations and knowledge of the case); see also State v. Roberts, 160 Vt. 385, 391-92, 631 A.2d 835 (1993). Any mistake made by the detective as to whether the premises were vacant was, moreover, a mistake of fact, not one of law. Compare United States v. Elliott, 50 F.3d 180, 187 (2d Cir.1995) (since the question whether a given unit is unleased is one of fact, the officers' belief that an area was vacant and thus the owner could consent to a search was a factual error, if error at all), cert. denied, --- U.S. ----, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996), with United States v. Brown, 961 F.2d 1039, 1041 (2d Cir.1992) (warrantless entry of tenant's apartment was unconstitutional where officer made the mistaken legal conclusion that a landlord's authority to turn off electrical appliances or lights also validated the officers' search of the apartment).
 
 
 104
 We, therefore, uphold the admission against Brazel of the parking ticket and tally sheet discovered at the apartment in question.
 
 G. Discovery Violation: Brazel
 
 105
 Brazel argues that the district court's admission of critical evidence that, allegedly, was withheld from the defense in violation of the government's discovery obligations under Fed.R.Crim.P. 16(a)(1)(A), warrants the reversal of his convictions and a new trial.
 
 
 106
 About one month into trial, the government sought to introduce as part of its case-in-chief certified copies of two guilty pleas entered by Brazel to state charges based on the same transactions underlying two counts of the federal indictment: his distribution of five grams or more of cocaine base to an undercover officer on March 22 and 25, 1991. Brazel's counsel objected to the admission of the pleas on the grounds that the state court pleas had not been produced in response to his pretrial discovery request and had not been included on the exhibit list provided to defense counsel at the beginning of the trial. He added that in making his opening argument, he was prejudiced by having to put forward Brazel's misidentification defense without being aware that the government meant to introduce the state court guilty pleas.
 
 
 107
 The prosecution told the district court in response that it had inadvertently overlooked the guilty pleas until only the day before, when reviewing documents to prepare witnesses to the transactions. It then immediately obtained copies of the pleas and turned them over to the defense the next morning. The prosecution added that Brazel was on notice that his admission of guilt to the state charges would be at issue in the federal case, since one month before trial the government filed an information and notice of prior convictions referring specifically to the two state court convictions.[18] The district court overruled Brazel's objection to the admission of evidence of the pleas. Without expressly determining whether the discovery obligations in Rule 16(a)(1)(A) had been violated, it ruled that Brazel's counsel knew or should have known that his admission of guilt to the state charges would be at issue.
 
 
 108
 We find no violation of Rule 16(a)(1)(A). The rule requires the government to disclose, upon a defendant's request, "any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government...." Fed.R.Crim.P. 16(a)(1)(A) (emphasis supplied). The government argues that the state court guilty pleas were not "within the possession, custody, or control of the government," for they remained with the state court clerk's office until the government obtained them during trial, at which time they were turned over to the defense. Binding precedent has construed the term "government" in Rule 16(a)(1) to refer to the "defendant's adversary, the prosecution," given the "repeated references to 'the attorney for the government' in 16(a)(1)(A), (B) and (D) and 16(a)(2)," and language in 16(a)(1)(C) referring to papers and documents "intended for use by the government as evidence in chief at the trial." United States v. Trevino, 556 F.2d 1265, 1271 (5th Cir.1977). "[W]ithin the possession, custody, or control of the government" does not include possession of a federal court or probation officer under Rule 16(a)(1), id., and thus logically does not include that of a state court. Nor does possession of the "government" normally extend to that of local law enforcement offices. See Thor v. United States, 574 F.2d 215, 220-21 (5th Cir.1978) (book containing witnesses' addresses was not discoverable under Rule 16(a)(1)(C) "because the book was not in the government's control, but in the control of the Oregon county police[ ]"); see also United States v. Chavez-Vernaza, 844 F.2d 1368, 1375 (9th Cir.1987) (in federal case initially investigated by local and state officers, Rule 16(a)(1)(C) did not require the prosecution to obtain items from state authorities relating to their acquisition of the defendant's financial records, for even if prosecution was aware of the documents, it did not have actual control or possession of them), cert. denied, 510 U.S. 1204, 114 S.Ct. 1324, 127 L.Ed.2d 672 (1994); United States v. Johnson, 679 F.2d 54, 58 (5th Cir.1982) (assignment of notes recorded in county was not shown to be in the "possession, custody, or control of the government" under Rule 16).[19]
 
 
 109
 Of course, a prosecutor may not "avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial; such evidence is plainly within his Rule 16 'control.' " Trevino, 556 F.2d at 1272. Nothing in this record, however, suggests that the prosecution deliberately left the state court guilty pleas with the state court offices to avoid its discovery obligations. When it realized that it did not have the pleas, it obtained them and immediately gave them to the defense counsel, or so the district court could believe.[20] Accordingly, the district court did not abuse its discretion in refusing relief to Brazel under Fed.R.Crim.P. 16(a)(1)(A).
 
 
 110
 H. Refusal to Strike Evidence Relating to Dismissed Charges: Archer
 
 
 111
 At the close of the government's case-in-chief, the government stipulated to dismiss count 13 and racketeering act 9 of the superseding indictment, which had charged Archer with attempted possession of cocaine on July 24, 1990. The evidence introduced to support these charges had showed an attempt to possess marijuana on July 24th, not cocaine as part of the Mathis operation. When the charges were dismissed, Archer moved for a mistrial or in the alternative to strike the evidence about the July 24th incident. The district court denied the motion after the government argued that the evidence was still relevant and that there was enough in the remaining counts to allow it to stand. Archer claims the district court erred in denying his motion to strike and in providing no curative instruction.
 
 
 112
 Archer objected below on relevancy grounds at the time the evidence was admitted and later when he moved to strike the evidence. On appeal, he presses the relevancy objection but for the first time adds the contention that the evidence was inadmissible under Fed.R.Evid. 404(b). The ruling on relevancy is reviewed for abuse of discretion, but the Rule 404(b) argument was not properly preserved and thus is reviewed for plain error only.[21]
 
 
 113
 The evidence that Archer sought to strike included testimony by Trooper Douglas Dodson and cooperating witness Hector Thompson. Dodson testified that on July 24, 1990, Archer was stopped for speeding on his way from Fort Lauderdale to St. Petersburg, and a search of his rental car (made, it was said, because of his nervous behavior and inconsistent statements) revealed substantial sums of cash, later determined to be $8700, and two scales in the trunk. Thompson, a passenger in the vehicle who cooperated with the government, testified that while in Fort Lauderdale, Archer had tried to pick up marijuana from a contact without success. Both witnesses testified that Archer said the car was rented in the name of Margaret Williams, a name Dodson recognized because Williams had been involved in an arrest several months earlier involving four people from St. Petersburg.[22] Exhibits introduced in support of Dodson's testimony (e.g., two bags found with the cash, photos of their contents) were also the object of the motion to strike.
 
 
 114
 When the government introduced evidence of the July 24th incident and Archer objected on relevancy grounds, the government explained that this evidence related to specific charges in the indictment (the ones later dismissed) and also tied into other evidence that would be presented later. The government elaborated on the tie-in to other evidence in response to Archer's motion to strike. It said that the evidence about the July 24, 1990 incident was relevant because: the $8700 in cash in Archer's possession was relevant to testimony showing he was distributing cocaine base during that period; even if Archer may have been planning to purchase marijuana, the cash he had may have been proceeds from distributing crack cocaine; the trooper identified scales in the car which Thompson testified he saw Archer use on later occasions to weigh "cookies" of crack cocaine; and other testimony showed Archer made trips to Fort Lauderdale, sometimes in a rental car, to purchase cocaine base. We find these reasons persuasive, and hold that it was not an abuse of discretion for the district court to find the evidence relevant and to deny Archer's motion to strike.
 
 
 115
 Neither did the district court commit plain error under Rule 404(b)[23] when it declined to strike this evidence. Rule 404(b) permits the introduction of a prior or uncharged act if the government can show (1) that the evidence was introduced for a proper purpose and not to prove character, (2) that the defendant committed the act, and (3) that the probative value of introducing the evidence was not substantially outweighed by its undue prejudice. United States v. Lampley, 68 F.3d 1296, 1299 (11th Cir.1995). Here, the evidence relating to July 24, 1990 plausibly showed intent, plan, preparation, and/or identity, since other testimony suggested that Archer used the same scale found in the car on July 24 to weigh crack cocaine cookies on later occasions and that he used a rental car in Williams' name to make trips to Ft. Lauderdale to purchase cocaine base during the conspiracy period. The evidence about the July 24 incident was no doubt prejudicial, but we cannot say that its prejudicial effect substantially outweighed its probative value or that it was plain error to have received the evidence. See id. at 1300 (no abuse of discretion in admitting evidence of a defendant's prior marijuana dealings to support charges of possession and conspiracy to distribute cocaine "despite their differing nature and remoteness in time") (citations omitted); see also United States v. Hitsman, 604 F.2d 443, 448 (5th Cir.1979).
 
 
 116
 Archer complains that the district court did not give a limiting instruction about evidence relating to the July 24th incident. He futilely requested one when the evidence was first introduced, but he did not repeat the request when he later moved to strike the evidence (merely incorporating all his previous arguments). We find that denial of a limiting instruction in these circumstances was not, in any event, reversible error given the very substantial evidence presented on the remaining counts against Archer.
 
 I. Hubbard's Right to a Fair Trial
 
 117
 1. Refusal to Give a Second Handwriting Exemplar
 
 
 118
 Hubbard complains that the jury was informed during the trial and the jury charge that he had refused to provide a second handwriting exemplar. The government asked for a second sample because the first was insufficient for the expert to make a comparison.[24] Hubbard objected to the government's request, saying that he had fully complied with the government's first request for such a sample, and he preferred that the jury hear the expert testify that he could not make a comparison. The court overruled the objection and ordered Hubbard to give a second sample, which he refused to do. At trial, the jury was read a stipulation between the government and Hubbard that he had complied with the government's first request for a sample but not its second.[25] The government's handwriting expert, who testified to handwriting comparisons of several codefendants, was allowed to testify that the insufficiency of Hubbard's handwriting exemplars prevented the witness from making a comparison between the known and unknown samples. The court later instructed the jury that it could weigh Hubbard's refusal to comply with the court's order as tending to prove consciousness of guilt.[26]
 
 
 119
 Hubbard argues that the jury instruction unfairly created the impression of an obstruction of justice, when he in fact had complied with the government's first request for a handwriting sample. However, given that he stipulated to the fact that he refused to obey the court's order to give a second handwriting sample, did not object to the admissibility of the stipulation, and did not object to the jury instruction regarding this issue, we review for plain error only. Under applicable precedent, it is not error, let alone plain error, for a jury to hear evidence of a defendant's refusals to provide handwriting samples and to be instructed that it may consider such refusals as evidence of a guilty conscience. See United States v. Stone, 9 F.3d 934, 942 (11th Cir.1993), cert. denied, 513 U.S. 833, 115 S.Ct. 111, 130 L.Ed.2d 58 (1994); United States v. Knight, 607 F.2d 1172, 1177 (5th Cir.1979). Here, the jury heard evidence of Hubbard's initial compliance as well as learning of his subsequent noncompliance. There was no error in the instruction given.
 
 2. Threat to a Witness
 
 120
 Hubbard argues that he was prejudiced on the second day of trial (February 9, 1993), when cooperating witness Willie Culver was allowed to testify that Hubbard had threatened him five days earlier. The alleged threat took place while both were in the holding cell, a fact that the court and government strenuously cautioned the witness not to mention. Culver testified, "Mr. Hubbard said that he will see me in five years and get with me and straighten me." Hubbard argues that this statement should not have been admitted, because it was unsubstantiated and irrelevant to the charges in the indictment (having occurred well after the conspiracy period). Hubbard also asserts that his right to cross-examination was restricted, because he could not confront Culver about where and how the threat was made without revealing that both Culver and Hubbard were being held in custody at the time.
 
 
 121
 Hubbard objected to the admissibility of Culver's testimony on relevancy grounds at trial, but now for the first time asserts a violation of Fed.R.Evid. 404(b). Absent a timely, specific objection, his 404(b) claim may be reviewed for plain error only, see supra n. 28. Review is limited to correcting for errors that " 'seriously affect the fairness, integrity or public reputation of judicial proceedings,' and then only when a miscarriage of justice would result." United States v. Williford, 764 F.2d 1493, 1502 (11th Cir.1985).
 
 
 122
 Rule 404(b) permits evidence of other wrongs to be introduced if the government can show that the evidence was introduced for a proper purpose and not to prove character, that the defendant committed the act, and that the probative value of introducing the evidence was not substantially outweighed by its undue prejudice. Lampley, 68 F.3d at 1299; supra Part II.H. The first part of this test is met, because evidence that a defendant threatened a witness is relevant to show consciousness of guilt, a permissible purpose under Rule 404(b). See Fed.R.Evid. 404(b) (evidence of other wrongs is inadmissible to show character, but admissible to show, e.g., knowledge or intent); see also United States v. Gonzalez, 703 F.2d 1222-23 (11th Cir.1983).
 
 
 123
 As to the second prong, Culver's testimony that Hubbard threatened him was subsequently corroborated by testimony of the government's witness, Alvin Terry.[27] This court will "defer to the district court's determination that the testimony was credible enough to allow a jury to find" that the act occurred. Lampley, 68 F.3d at 1299-1300 (citation omitted). While the court here did not make an express credibility determination, it obviously thought Culver's testimony "credible enough" to go to the jury.
 
 
 124
 The third prong of the admissibility test under Rule 404(b) concerns whether the probative value of the evidence in dispute was substantially outweighed by the threat of undue prejudice. As noted earlier, evidence that a defendant threatened a witness shortly before trial may be probative of a defendant's consciousness of guilt. See Gonzalez, 703 F.2d at 1223. Here, the court gave a limiting instruction that the evidence of the threat was to be considered against Hubbard only, and that it "certainly was not something that occurred at or near the time of the alleged charges in this case, or these cases." In light of the latter instruction to the jury, the jury's exposure to conflicting testimony as to whether a threat was actually made, and the substantial independent evidence against Hubbard, we cannot conclude that the admission of this evidence rose to the level of plain error.
 
 
 125
 Hubbard also complains that he was deprived of his Sixth Amendment right to confront witnesses, because he could not cross-examine Culver about the specific circumstances surrounding the alleged threat without the jury's learning that Hubbard was being held in custody (as was Culver) before trial. But the fact that cross-examination is fraught with the peril of bringing out other facts detrimental to a defendant does not amount to a denial of that right. See United States v. Hines, 696 F.2d 722, 731 (10th Cir.1982) (no violation of confrontation right where defendant declined to cross-examine his probation officer for tactical reasons). Hubbard's sole basis for arguing that he was deprived of an effective cross-examination of Culver was that the district court, in deference to the wishes of the prosecutor and defense attorneys, had warned against inquiry into the fact that Culver had been in custody. But Hubbard never told the court that he actually wanted to question Culver in such a way as to risk bringing out their incarceration together. Hubbard in fact moved for a mistrial when other defense attorneys unintentionally referred to this. The court's warnings would appear to have been an attempt to accommodate what it believed were Hubbard's own wishes, as well as to prevent the prejudicing of any defendant including Hubbard. See Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) ("trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, ... prejudice"). We see no basis, in these circumstances, for Hubbard to argue that he was prevented from cross-examining Culver effectively.
 
 
 126
 3. Admission of Cordless Telephone Conversations
 
 
 127
 Hubbard argues that he was prejudiced by the admission of numerous cordless and cellular telephone conversations that were illegally obtained by the government. The argument is entirely without merit. Hubbard did not move to suppress the recordings in the district court, and his argument that the recordings were excludable under state law is, in any event, without relevance here. " '[I]t is well settled that federal law governs the admissibility of tape recordings in federal criminal cases,' and complaints that the evidence was obtained in violation of state law are of no effect." United States v. Butera, 677 F.2d 1376, 1380 (11th Cir.1982) (rejecting that warrantless tape recordings should have been suppressed under Florida constitutional law because state and local officials were involved in the investigation) (quoting United States v. Nelligan, 573 F.2d 251, 253 (5th Cir.1978)), cert. denied, 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); accord United States v. Workman, 80 F.3d 688, 695 (2d Cir.1996).
 
 
 128
 J. Whether Regulated Access to Courtroom Denied Defendants Their Right to a Public Trial
 
 
 129
 Defendants argue that the district court's requirement, three weeks into trial, that all persons who intended to enter the courtroom identify themselves (by identification card, name, address, and birth date) violated their Sixth Amendment right to a public trial. While defendants did not object when the court first announced the procedure on February 23, they objected the next day after the girlfriend of one defendant, who is not a party to this appeal, identified herself in order to enter the trial and was arrested by a U.S. Marshal when exiting the courtroom for failure to appear at a state hearing. The government does not suggest, and we do not find, that defendants waived their right to object concerning this matter.
 
 
 130
 The Sixth Amendment right to a public trial is not absolute and must, on occasion, give way to other rights and interests. Waller v. Georgia, 467 U.S. 39, 45, 104 S.Ct. 2210, 2214, 81 L.Ed.2d 31 (1984). The purposes of the public-trial guarantee are to ensure that judges, lawyers, witnesses, and jurors perform their functions responsibly; to encourage witnesses to come forward and discourage perjury; and to allow the public to see that a defendant is tried fairly. Id. at 46, 104 S.Ct. at 2214-15 (citations omitted). To further these interests, a party seeking total closure of a proceeding would have to show that the measures taken were necessary to serve an overriding interest, and the court would have to consider other alternatives and make findings adequate to support closure. Id. at 48, 104 S.Ct. at 2216-17 (stating standard in case where seven-day suppression hearing was closed to all but witnesses, court personnel, the parties, and counsel). Where proceedings are only partially closed, however, the test is less stringent; a "substantial" rather than a "compelling" reason is required where at least some access by the public is retained. Douglas v. Wainwright, 739 F.2d 531, 533 (11th Cir.1984), cert. denied, 469 U.S. 1208, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985). Defendants characterize this case as a "complete closure," because the identification procedure, once imposed, remained in effect throughout the remainder of the trial. We think, however, that if the identification procedure can be said to have imposed a closure at all, it was "partial," as all persons wishing to enter the courtroom were allowed to do so provided they identified themselves as required, and the required identification was not especially arduous. See id. at 532 ("partial closure" where press and family members of defendant, witness, and decedent were allowed to remain in courtroom during one witness's testimony); cf. Herring v. Meachum, 11 F.3d 374, 380 (2d Cir.1993) (trial court's decision to lock doors during jury charge "did not amount even to a partial closure," since all members of the public and press could attend if they arrived in time and space was available), cert. denied, 511 U.S. 1059, 114 S.Ct. 1629, 128 L.Ed.2d 353 (1994).
 
 
 131
 Assuming a partial closure, a "substantial reason" would be needed to justify it. The district judge (who was the chairperson of the security committee and also the administrative judge for the building) implemented the procedure sua sponte, noting that a previous trial that received much attention had done the same and she wanted to "keep tabs on the comings and goings of people in and out of the Courthouse." When defendants objected the next day, the judge noted that she had observed during the last week and into the present one that individuals were entering and "going into various positions in this courtroom and ... staring at the witnesses that were on the stand." The fixed stares were "making the witnesses uncomfortable, because I observed it." The court expressed concern with individuals "in any way attempt[ing] to influence or affect the testimony of any witness" or "affecting anybody who is a participant in this trial as a defendant, as a juror, as a witness, as a lawyer, as a party." The prosecution said that case agents had observed the same behavior (fixed stares at both witnesses and counsel at the government's table). Defendants objected that the identification procedure could have a chilling effect on the public, because some people might fear that if they identified themselves (by name, address, and birth date), a computer check might be run and they might be suspected of being a part of the drug conspiracy. Defendants proposed that to avoid infringing on their clients' rights to a public trial, a less restrictive measure be used, e.g., having the judge identify those individuals in the courtroom she thought were impeding a fair trial and then recessing to have the marshals identify them.
 
 
 132
 We find no violation of the Constitution. The trial judge implemented the identification procedure based on her own observations for more than a week, confirmed by the prosecution, that individuals had been coming into the courtroom and fixing stares on the witnesses and possibly government counsel. The court considered the alternative proposed by defendants, but reasonably found it infeasible. She did not believe that, while presiding over the trial, she could assume the responsibility to pick out individuals who might be trying to influence the witnesses or might otherwise pose a threat to trial participants. Given the specific problem that had arisen and the limited nature of the remedy adopted, we see no abuse of discretion in what was done. The record shows only one specific instance where someone decided not to enter because identification was required (a federal employee on lunch break who apparently did not want others to know she was there).[28]
 
 
 133
 K. Whether Use of Leg Shackles Deprived Defendants of a Fair Trial
 
 
 134
 Defendants argue that they were deprived of their presumption of innocence and a fair trial when the district court required them to wear leg shackles for the last four weeks of trial. The Supreme Court has stated that "the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, [and] the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings," but in some situations, shackling "might possibly be the fairest and most reasonable way" to handle a contumacious defendant. Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). The Fifth Circuit similarly has stated:
 
 
 135
 Shackling is an extreme measure, but in some circumstances it is necessary for the safe, reasonable and orderly progress of trial. The decision to shackle lies within the sound discretion of the trial court and will not be overturned by reviewing courts unless that discretion was abused.
 
 
 136
 United States v. Theriault, 531 F.2d 281, 284 (5th Cir.) (internal citations omitted), cert. denied, 429 U.S. 898, 97 S.Ct. 262, 50 L.Ed.2d 182 (1976). We hold that the district court's actions were within its discretion here.
 
 
 137
 Two months into trial, on April 12, 1993, the court held an in-chambers conference at which the prosecution and a U.S. Marshal raised concerns about security. The prosecution stated that: (1) the defendants' behavior has sometimes been disruptive and defiant to U.S. Marshals when exiting the courtroom, and in particular, defendant Hubbard "has made several direct derogatory comments to the Court, to the United States Marshal Service and the Marshals who have been in charge maintaining security in the Courtroom";[29] (2) female U.S. Marshals had reported to the prosecution on numerous instances that defendants had challenged them verbally and physically with respect to their authority; (3) there was at least one outburst by codefendants Jefferson and Brazel; (4) three defendants (believed to be Brazel, Jefferson, and McNealy) were observed making threats to a witness on the stand by holding a finger up to their heads as if to shoot; (5) all defendants were facing life sentences; and (6) one afternoon after a recess of the trial, a small caliber projectile was shot at the front door of the courthouse, which may or may not have been related to this case. A U.S. Marshal added that the defendants' behavior had changed "dramatically" in the last week, and "they bec[a]me generally more defiant and more disruptive and kind of getting an I don't care attitude for whatever reason." The district judge expressed concern for the safety of everyone in the courtroom as the trial progressed into its final stages and noted the small size and layout of the courtroom. She indicated that the minimum security measures necessary should be implemented in a way that would not prejudice the defendants. After instructing defense counsel not to pass defendants anything (pens, etc.), she raised the possibility of shackling the defendants while placing cloths around the counsels' tables so that the jury did not see anything. The conference ended with the court allowing defense counsel an opportunity to speak to their clients before any decision was made.
 
 
 138
 Later that day at sidebar, defense counsel jointly objected to the proposed security measures, denied that defendants' conduct was as defiant as had been represented, and noted concern about the potential effect on jurors. Individual defense attorneys also commented: one proposed that additional marshals be placed in the courtroom, with any individual defendants who were defiant receiving more aggressive treatment; one said that given his client's youth and background, shackling him would make him feel like less than a human being; others stressed that any measure should not exclude their client from the courtroom. The district court ultimately decided, on April 13, 1993, to require all defendants to wear leg shackles but to hide them from the jury by covering all the tables (including the prosecution's) with blue cloths. A camera was put into place on the side of the bench near the jury.
 
 
 139
 We find no abuse of discretion in the district court's decision to allow the use of leg shackles in these circumstances. The court acted reasonably on the basis of the prosecution's and marshals' representations as to defendants' conduct, its own direct observation of the demeanor of the defendants and witnesses and of changes occurring in the previous week, the fact that defendants faced life sentences, and the potential for outbursts or escape attempts as the end of trial approached. See Allen v. Montgomery, 728 F.2d 1409, 1413 (11th Cir.1984) ("[P]hysical restraints and added security precautions may be required to protect courtroom personnel, including the judge, the jury, and the lawyers, against threatened harm.") (citation omitted); Zygadlo v. Wainwright, 720 F.2d 1221, 1223 (11th Cir.1983) (no abuse of discretion in requiring defendant to wear leg shackles at trial where district court was aware of defendant's previous escape attempt and observed defendant at trial), cert. denied, 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984). The court's use of cloths to cover all counsels' tables so that the leg shackles were not visible significantly reduced the possibility of prejudice. Cf. Allen, 728 F.2d at 1413 (where jurors caught at most a brief glimpse of defendant in handcuffs, there was no abuse of discretion in imposing strict security measures where death threats had been made against the trial judge and a witness).
 
 
 140
 Before authorizing the shackles, the court gave defense counsel the opportunity to respond to its concerns and the proposed actions, and to raise alternative proposals. While denying a requested hearing on the specifics underlying the security measures, the court explained that three defendants had, among other things, been seen making intimidating gestures to a witness. The court alluded, without elaboration, to "potential matters external to this building."[30] Cf. Theriault, 531 F.2d at 285 (when district court implements unusual visible security measures, it is required to state reasons for doing so on the record and give counsel an opportunity to respond; a formal evidentiary hearing is not required, but, in order to facilitate appellate review, "the taking of evidence and finding of facts may be necessary" if the factual basis for extraordinary security is controverted).
 
 
 141
 Defendants, moreover, have not shown a realistic likelihood that they were prejudiced by what was done, the shackles having been screened from view. Cf. Allen, 728 F.2d at 1414 (brief encounter with a handcuffed defendant is not inherently prejudicial and requires an affirmative showing of prejudice by the defendant) (citation omitted). Defendants speculate that the jury might have inferred the existence of the restraints from the fact that the cloths and a camera suddenly appeared in the courtroom without explanation. One defense attorney asked the court to explain the changes to the jury, but no one objected when the court stated that that was not necessary.[31]
 
 
 142
 We find no abuse of discretion in the court's handling of the situation, which was restrained and carefully tailored to address reasonable security concerns that had arisen.
 
 L. Other Issues
 
 143
 In addition to the foregoing, defendants-appellants have raised other issues, including the following: that law enforcement officers violated procedural due process protections when they referred the case from state to federal authorities for prosecution; that the district court erred in denying a mistrial after prejudicial evidence was introduced against Jefferson during a codefendant's cross-examination of a government witness, and also, after improper prosecutorial comments during closing arguments; that the court erred in refusing to order the government to disclose part of the grand jury proceedings; that the disproportionality of sentences for crack and powder cocaine violate the Eighth Amendment. We have carefully considered all of these arguments and find none to have merit.
 
 M. Alleged Sentencing Errors
 
 144
 Defendants McKinnon, Brazel, Burgess, Hubbard, Jefferson, and McNealy argue, among other alleged sentencing errors, that the district court clearly erred in calculating the amount of crack cocaine attributable to each of them. We evaluate these challenges under the United States Sentencing Commission, Guidelines Manual (Nov. 1992), which was in effect at the time of the sentencing.
 
 1. The Sentencing Hearings
 
 145
 The district judge who presided over trial sentenced the defendants at hearings held in August and September 1993. The trial record was incorporated, and some additional testimony was given about the quantity of 50-packs ("packs") of crack cocaine supplied and distributed in connection with the Mathis organization from March 1990 until November 1, 1991. That evidence and the calculations accepted by the sentencing court follow.
 
 
 146
 Detective McConaughey, the case agent, testified that based on conversations with former shift workers Mark Muse, Corbett Talbert, and Ronald Brinson, the quantity of crack cocaine sold on the north side from March 1990 until mid-November 1990 was a low of 15 packs and a high of 60 packs daily. This total broke down by shift to about 1 1/2 to 5 packs for the midnight workers, a low of 3 to 5 packs to a high of 10 to 15 packs for the day workers, and a low of 5 to 10 packs to a high of 30 packs for the evening workers. The government relied on the detective's low estimate of 15 packs per day, seven days a week, and calculated that at least 105 packs were sold per week. Each 50-pack was estimated to weigh 12.5 grams.[32] Taking 105 50-packs at 12.5 grams each[33] for 36 weeks (from March until mid-November 1990), the government arrived at a total of 46.8 kilograms sold on the north side.
 
 
 147
 Detective McConaughey further testified, based on a conversation with Brinson, that the quantity sold at Preston Avenue from mid-November 1990 through early January 1991 was between 30 and 60 packs per day. The government relied on the low of 30 packs sold daily and calculated that 210 packs were sold per week, each of which weighed an average of 12.5 grams. Over a nine-week period, the total sold at Preston Avenue was 23.4 kilograms.
 
 
 148
 The government incorporated specific evidence from the trial to calculate the quantity sold at 14th Avenue and Highland Street from early February until April 24, 1991. A notebook offered into evidence showed that for a five-day period in March (March 2-6, 1991), an average of 33.4 packs were sold per day. Four witnesses' trial testimony corroborated this figure; they testified that between 10 and 16 packs were sold per shift, for a total of at least 30 packs over three shifts daily. The government used the minimum of 30 packs daily to calculate that 210 packs were sold per week, at 12.5 grams per pack. Over a twelve-week period, the total sold on 14th Avenue South and Highland Street was determined to be 31.2 kilograms.
 
 
 149
 The government relied on the trial record to determine the quantities attributable to the Mathis organization between May and November 1, 1991. During that period, drugs were sold on the south side at various locations including 15th and 16th Avenue South, 1222 19th Avenue South, and 2320 Fairfield Avenue. One former supplier for Mathis testified at trial that for about eight weeks in May and June, the Jamaicans supplied 3 to 5 kilograms of crack cocaine every two weeks, for a minimum of 12 kilograms. McNealy, Jefferson, and Hubbard also supplied the organization during that time, and were the sole suppliers from July 1 through November 1, 1991. Several witnesses testified that they had seen the three, individually or together, on numerous occasions deliver large amounts of what was believed to be crack cocaine to Mathis's house or to other workers. For purposes of calculating quantity, the government relied initially on testimony specifying that a certain number of 50-packs were seen delivered by McNealy, Jefferson, and/or Hubbard. This testimony was as follows: McNealy, 90 packs; Jefferson, 170 packs; McNealy and Jefferson, 80 packs; Hubbard, 90, 100, 180, and 186 packs; 233 packs were delivered to the safe at 45th Avenue, where only one of the three would have made a delivery; and McNealy and Hubbard returned money to an overseer for 133 packs. These deliveries added up to 1262 50-packs, which, at 12.5 grams per pack, amounted to 15.775 kilograms. The government added to that 4 kilograms which a witness testified was the amount that Hubbard had with him around midnight on October 31, when he left Mathis's house with two others and went to McKinnon's apartment to cut and bag crack cocaine. Thus, in addition to the 12 kilograms supplied by the Jamaicans, almost 20 kilograms were specifically identified as being supplied by McNealy, Jefferson and/or Hubbard.
 
 
 150
 The government increased its initial figure for McNealy, Jefferson, and Hubbard (based on specifically identified quantities) in order to estimate the total amount supplied by them from May until November 1. This was done based on one trial witness's testimony that during September and October 1991, McNealy, Jefferson, and Hubbard supplied the Mathis organization every three days (or about twice a week). The government selected, from the specifically identified figures above, the 90 and 180 packs delivered on two occasions in the fall to estimate that 270 packs on average were delivered per week; at 12.5 grams per 50-pack, that amounted to 3.375 kilograms per week. The government rounded that figure down to 3 kilograms, multiplied it by the 25-week period from May to November 1, and arrived at 75 kilograms as the amount supplied to the organization by McNealy, Jefferson, and Hubbard. Adding to that the 12 kilograms supplied by the Jamaicans in the spring of 1991, and the 4 kilograms supplied by Hubbard on October 31/November 1, the government concluded that at least 91 kilograms were attributable to the Mathis organization from May until November 1, 1991.
 
 
 151
 The sentencing court ruled that the testimony underlying the government's figures was credible and it accepted the government's proposed figures: 46.8 kilograms for the north side; 23.4 kilograms for Preston Avenue; 31.2 kilograms at 14th Avenue and Highland; and about 91 kilograms at the other south side locations during 1991.
 
 2. Drug Quantity Calculations
 
 152
 The defendants challenge the method that the government used, and the district court accepted, to calculate drug quantity. While rejecting most aspects of their challenge, we agree that one part of the calculations was insufficiently supported: the determination that 91 kilograms was supplied from May until November 1991. The government's initial calculation for that period, based on quantities that witnesses specifically saw or knew were delivered by the suppliers, totaled almost 32 kilograms (12 kilograms by the Jamaicans, 15.775 in identifiable quantities by McNealy, Jefferson, and/or Hubbard, and 4 kilograms by Hubbard). This figure was clearly based on adequate evidence. See United States v. Hansley, 54 F.3d 709, 714 & nn. 4 & 5 (11th Cir.) (basing calculations on specific number of attempted trips to purchase drugs and reliable determinations of quantity), cert. denied, --- U.S. ----, 116 S.Ct. 539, 133 L.Ed.2d 444 and --- U.S. ----, 116 S.Ct. 540, 133 L.Ed.2d 444 and --- U.S. ----, 116 S.Ct. 575, 133 L.Ed.2d 498 and --- U.S. ----, 116 S.Ct. 582, 133 L.Ed.2d 504 (1995).
 
 
 153
 More questionable are the government's extrapolations from the evidence to increase the drug quantity for that period up to a specific figure of 91 kilograms. The basis for the increase was one trial witness's testimony that McNealy, Jefferson, and Hubbard supplied drugs for the Mathis organization every three days during September and October 1991--about twice a week for an eight-week period--and that two times during that period the quantity delivered by Hubbard was 90 and 180 50-packs. From this alone the government concluded that these three defendants supplied drugs to the Mathis organization at a constant weekly rate of 270 50-packs for the entire six-month period between May and November 1, 1991--notwithstanding evidence showing that Mathis had other suppliers as well until July 1, 1991, and no evidence establishing a level rate of supply by McNealy, Hubbard, and Jefferson over a six-month period.[34] Despite a specific challenge to this particular methodology by at least one defendant, the district court accepted the estimate without any inquiry about the basis for the government's selection of the 90 and 180 50-packs--delivered sometime in September or October (the witness could not recall when)--as being representative of the average weekly delivery to the Mathis organization in the fall of 1991, let alone from the spring through the fall.
 
 
 154
 Sentencing cannot be based on calculations that are merely speculative.[35] While we accept, and reliable evidence of record establishes, that the initial figure of 32 kilograms, as well as some greater amount, was properly attributable to the Mathis organization between May and November 1991, we are not satisfied that the record supports a finding of 91 kilograms. We need pursue the matter no further, however, since the reliable evidence of record, in its entirety, is more than adequate to support all the defendants' sentences. At the time of sentencing, the highest base offense level of 42 applied to a quantity of cocaine base of 15 kilograms or more and required a life sentence.[36] This minimum quantity was more than properly established as to each defendant based on sufficiently reliable evidence.
 
 3. Attributable Drug Quantities
 
 155
 Several defendants challenge the district court's findings concerning the extent of their involvement in the conspiracy and the corresponding amount of crack cocaine attributable to them. Having carefully reviewed the record and the briefs, we uphold the sentences and find only McKinnon's challenge deserving of discussion.
 
 
 156
 McKinnon was found guilty of one count of conspiracy to distribute cocaine base. The sentencing court accepted the recommendations by the prosecution and in the PSR that she be held responsible for the entire amount of crack cocaine distributed from March 1990 until November 1, 1991, and, finding a total offense level of 44[37] and criminal history category of I, sentenced her to life imprisonment. McKinnon argues that the district court's factual findings were clearly erroneous, because the evidence at trial and sentencing did not show that she ever agreed to participate in a conspiracy to distribute drugs. She also faults the district court for failing to make specific findings as to the extent of drug activities undertaken by her and the specific quantities attributable to her. We find these arguments unpersuasive, for the district court made specific rulings as to McKinnon's role and the foreseeability of her coconspirators' acts, and we cannot say that its factual findings were clearly erroneous. See Hansley, 54 F.3d at 714; see also U.S.S.G. § 1B1.3(a)(1).
 
 
 157
 McKinnon testified at the sentencing hearing. Under oath, she stated that she was not involved in the conspiracy, that since trial a few cooperating witnesses had told her they lied at trial or had apologized for their testimony,[38] that she was coerced into staying with Mathis because of an abusive relationship, that Mathis shared little of his "business dealings" with her, and that she did not profit from the activities of the conspiracy, as she had her own job driving a school bus from mid-1988 until February 1991, when she left after learning she had become pregnant. As detailed earlier, however, there was sufficient evidence presented at trial for a reasonable jury to find that the government proved the conspiracy charge against McKinnon beyond a reasonable doubt. The record of the trial was incorporated at sentencing, and the sentencing court was required to make findings supported only by a preponderance of the evidence. The question before us, then, is not whether McKinnon agreed to become a part of the conspiracy, but whether the district court committed clear error in determining the scope of her agreement and the extent to which her coconspirators' acts in furtherance of the conspiracy were reasonably foreseeable to her. "A sentencing court may not speculate on the extent of a defendant's involvement in a conspiracy," United States v. Adams, 1 F.3d 1566, 1581 (11th Cir.1993). A preponderance of the evidence must support its findings.
 
 
 158
 We have carefully reviewed the record and do not find clear error in the factual findings supporting McKinnon's sentence. The district court properly rejected McKinnon's contention that she fell within application note 5 of U.S.S.G. § 1B1.3, which narrowly defines a defendant's "relevant conduct" for sentencing purposes if she is merely, as the example explains, a girlfriend of a drug-trafficker who knows about his activities and agrees to participate on one occasion.[39] The evidence against McKinnon established much more, according to the specific findings made by the sentencing judge based predominantly on the evidence presented at the three-month trial, over which she had presided.[40] After listing the specific evidence against McKinnon, the sentencing judge concluded:
 
 
 159
 [McKinnon] was a willing participant in this conspiracy. She was at the highest level of the organization and she was in there for what could be derived by all of them, including her, from this operation and that it was reasonably foreseeable that all of the events that occurred did, in fact, turn out the way it was planned by these people.... I don't think that the Government's calculations are inflated at all. I think they're extremely conservative for what reasonably could have taken place in twenty-four hours per day, seven days a week. When the north side operation was in effect for thirty-six weeks, forty-six point eight kilos is reasonably foreseeable. For the period of time nine weeks at Preston was open, twenty-three point four kilos is reasonable. For the twelve weeks that Highland and 14th was open, thirty-one point two kilos is reasonable. I think those total up to something around a hundred and--I think that's around one hundred kilos right there, not far off the mark, maybe slightly in excess of that. And then when you look at the twenty-five weeks between May and November of 1991, conservatively that's ninety kilos. There is something when you add up all of those figures in excess of one hundred and ninety kilograms of cocaine.... And this Court specifically finds that all of that was reasonably foreseeable. It was part of what this conspiracy organizationally was intended to achieve. And everyone that was a part of it knew it, it's what they wanted to have happen and your client was in there all the way, period.
 
 
 160
 The district court's finding that the total amount of drugs during the conspiracy was attributable to McKinnon is supportable, though it was not required for her base offense level to start at 42.
 
 
 161
 4. "Minimal Participant" Adjustment: McKinnon
 
 
 162
 McKinnon argues that the district court erred in refusing to decrease her sentence by four levels under U.S.S.G. § 3B1.2(a) for being a minimal participant. This subsection applies to defendants "who are plainly among the least culpable of those involved in the conduct of a group.... [T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." U.S.S.G. § 3B1.2 comment. (n. 1). We are constrained to review the district court's refusal to allow the downward adjustment for clear error only, and cannot say that this high standard was met here. The district court heard the witnesses' testimony at trial, and its findings at sentencing based on that evidence support its conclusion that McKinnon played more than a minimal role in the conspiracy. See United States v. Cacho, 951 F.2d 308, 309-310 (11th Cir.1992).
 
 
 163
 5. "Prior, Final Convictions" Enhancement: Brazel
 
 
 164
 Brazel was convicted of conspiracy to distribute cocaine base and two substantive distribution offenses on March 22 and 25, 1991. He was sentenced on all three counts to concurrent terms of life imprisonment.[41] He argues on appeal that the district court erred in imposing a mandatory minimum life imprisonment term on the conspiracy count because he had committed the offense "after two or more prior convictions for a felony offense have become final." 21 U.S.C. § 841(b)(1)(A). Brazel argues that the two Florida convictions for selling crack cocaine on March 22 and 25, 1991 were not "prior" offenses because they occurred during the conspiracy, and further, they were not "final" within the meaning of the statute. The government concedes the latter point, so we need not address the former. This circuit has held that for purposes of enhanced sentencing under this statutory provision, a conviction is not final until "all avenues of direct attack have been exhausted." United States v. Lippner, 676 F.2d 456, 467 (11th Cir.1982) (construing finality requirement in § 841(b)(1)(B), which contains same pertinent language as § 841(b)(1)(A)); see also United States v. Lovell, 16 F.3d 494, 497 (2d Cir.1994) (collecting circuit cases). Brazel was convicted of the state counts on October 17, 1991 and was sentenced on November 18, 1991. While the record does not show whether he appealed, it is clear he would not have exhausted his appeal rights under state rules until after the conspiracy had ended. Thus, the provision for enhanced sentencing based on prior, final convictions was inapplicable. However, Brazel is not entitled to a remand, because life sentences on each count were required by his total offense level of 47 and criminal history category of III. See U.S.S.G. § 5A & comment. (n. 2) (Nov. 1992).
 
 
 165
 6. Enhancement for Obstruction of Justice: Jefferson
 
 
 166
 Jefferson argues that the district court erred in increasing his base offense level by two points for obstruction of justice under U.S.S.G. § 3C1.1[42] based on his refusal to comply with an order to provide handwriting exemplars. Jefferson contends that he did not have the requisite intent to obstruct justice; rather, he refused to provide the exemplars because he distrusted the government's investigation after having viewed a videotape of the Burger King transaction on August 15, 1991, which had been taken to support two counts that were ultimately dismissed against him during trial.
 
 
 167
 We review the district court's factual findings on this matter for clear error, and its application of the enhancement de novo. See United States v. Taylor, 88 F.3d 938, 942 (11th Cir.1996). The district court found that Jefferson made a decision to defy authority rather than provide exemplars which the government was seeking in order to compare his writing to that on drug tally sheets. Having examined the record, we are satisfied that the two-level enhancement was appropriate. Id. at 944.
 
 III. Conclusion
 
 168
 We AFFIRM all of the defendants' convictions and sentences.
 
 
 169
 So Ordered.
 
 
 
 *
 Honorable Levin H. Campbell, Senior U.S. Circuit Judge for the First Circuit, sitting by designation
 
 
 [1]
 Mathis's trial was severed and commenced in February, 1994
 
 
 [2]
 Tucker testified that McKinnon and Mathis were on "bad terms" at the time, and she was living in an apartment of her own with her and Mathis's newborn son, whom she had given birth to on September 6, 1991
 
 
 [3]
 See also United States v. Ivy, 83 F.3d 1266, 1284-1287 (10th Cir.1996) (upholding conspiracy conviction where defendant claimed he had no specific task within the conspiracy but was shown to have facilitated the venture as a whole); United States v. Zafiro, 945 F.2d 881, 887-88 (7th Cir.1991) (sustaining conspiracy conviction of leading drug distributor's girlfriend where evidence showed that he occasionally stayed at her apartment and stored a suitcase of cocaine in a closet there, both were arrested there while awaiting a large delivery of cocaine, and expert witness gave uncontroverted testimony that drug dealers do not discuss or deliver large quantities of drugs in presence of innocent bystanders), aff'd on other grounds, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)
 
 
 [4]
 Section 1962(d) provides:
 It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.
 
 
 [5]
 The court instructed:
 [T]he Defendants named in count one of that Indictment, the conspiracy count, are not charged in that count with violating Section 1962-C. Rather they are charged with knowing [sic] and willfully conspiring to violate that law, the alleged conspiracy itself being a separate crime or offense in violation of Section 1962-D.
 So under that law, a conspiracy is a combination or agreement of two or more persons to join together to attempt to accomplish an offense which would be in violation of Section 1962-C as elsewhere defined in these instructions. It is a kind of partnership in criminal purposes in which each member becomes the agent of every other member.
 
 
 [6]
 McKinnon also requested that the court instruct the jury: "Casual transactions with persons involved in a conspiracy are insufficient to establish a defendant's guilt in a conspiracy beyond a reasonable doubt." The refusal to give this portion of the request has not been appealed, defendant having conceded to the district court that it was covered by other instructions
 
 
 [7]
 Rather, the court instructed the jury to consider this part of Thomas's testimony against Jefferson, McNealy, and Archer, with respect to the charges of racketeering and conspiracy to commit racketeering
 
 
 [8]
 Racketeering act 24 of count 1 (RICO conspiracy) was also struck
 
 
 [9]
 Rule 48(a) provides:
 The Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.
 
 
 [10]
 Rule 48(a) covers the dismissal of counts of an indictment as well as the whole. See, e.g., United States v. Raineri, 42 F.3d 36, 42-43 (1st Cir.1994) (analyzing dismissal of one count after defendant pled guilty to three), cert. denied, --- U.S. ----, 115 S.Ct. 2286, 132 L.Ed.2d 288 (1995); Woodring v. United States, 311 F.2d 417, 424 (8th Cir.) (allowing dismissal of one count before case was submitted to the jury), cert. denied, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963)
 
 
 [11]
 Cf. United States v. Del Vecchio, 707 F.2d 1214, 1216 (11th Cir.1983) (per curiam) (absence of defendant's consent did not violate Rule 48(a) where trial had not yet commenced); accord United States v. Arzate, 545 F.2d 481, 481 (5th Cir.1977) (per curiam)
 
 
 [12]
 This evidence included testimony by Charles Scott, FBI Special Agent Eric Bryant, Officer Richard Tapia, and fellow inmate Larry Thomas, the cooperating witness who testified to alleged admissions by Jefferson while they were in custody
 
 
 [13]
 Courts have in rare instances allowed judgments of acquittal before the close of the government's evidence in the interests of fairness to the defendant and judicial efficiency, notwithstanding the plain language of the rule. See United States v. Ingraldi, 793 F.2d 408, 413-414 (1st Cir.1986) (discussing cases); 2 Charles Alan Wright, Federal Practice and Procedure § 462 at 639 & n. 2 (1982)
 
 
 [14]
 The documents showed that Ms. McNealy stopped work the end of August 1991, received weekly worker's compensation benefits of $166 per week, and resumed work the end of September 1991 at a rate of $6.50 per hour. On September 25, 1991, she co-signed a lease which required monthly payments of $559
 
 
 [15]
 Although Brazel failed to file a pretrial motion to suppress, the district court ruled on the merits of his motion at trial, and that ruling is now reviewable. See United States v. Crosby, 739 F.2d 1542, 1548 (11th Cir.), cert. denied, 469 U.S. 1076, 105 S.Ct. 576, 83 L.Ed.2d 515 (1984)
 
 
 [16]
 The government points out that, at sentencing, Brazel argued that the record contained no evidence that he lived at the apartment anytime after September 1991, and that Brazel's PSR shows that he lived with his grandmother for three years before his arrest in this case
 
 
 [17]
 According to the detective, the landlord said the last person there was a Mr. Cotter, but the detective then said that he independently knew the last person was actually someone else (Ms. Ladson) who had moved out in early October of 1991
 
 
 [18]
 The state court convictions were formally entered on October 17, 1991. The government's filing listed the two convictions and quoted 21 U.S.C. 841(b)(1)(A) as follows: "If any person commits a violation of this subchapter ... after two or more convictions for a felony drug offense have become final, such persons shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence."
 
 
 [19]
 While it is possible that the term "government" in Rule 16(a)(1) may include investigative agencies aligned with the prosecution and to which the prosecution has ready access, that must be determined on a case-by-case basis. See Trevino, 556 F.2d at 1272; cf. United States v. Bryant, 439 F.2d 642, 649-50 (D.C.Cir.1971) (tape recording of undercover drug deal with defendant, taken by agents of Bureau of Narcotics and Dangerous Drugs, was discoverable under Rule 16(a)(1), because "government" may include both the prosecution and an aligned investigative agency)
 
 
 [20]
 See United States v. Cannington, 729 F.2d 702, 711-12 (11th Cir.1984) (where defendant's entire defense was misidentification and the prosecution introduced a rental agreement with his signature on it which had not been disclosed before trial, Rule 16(a)(1)(A) was not violated because the prosecution did not possess the evidence until a witness produced it during trial; the document was immediately given to the defense, and the trial court was within its discretion in finding that the prosecution acted in good faith and could not have produced what it did not have)
 
 
 [21]
 See United States v. Williford, 764 F.2d 1493, 1502 (11th Cir.1985) ("Evidentiary errors that are not specifically objected to at trial are reviewed for plain error. We correct only for errors that are particularly egregious and that 'seriously affect the fairness, integrity or public reputation of judicial proceedings,' and then only when a miscarriage of justice would result.") (internal citations omitted); see also United States v. Dennis, 786 F.2d 1029, 1042 (11th Cir.1986) (where objection at trial to admissibility of evidence was based on relevancy and hearsay and not on ground urged on appeal, review was for plain error only), cert. denied, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 814 (1987); accord United States v. Carrillo-Figueroa, 34 F.3d 33, 40 (1st Cir.1994) ("since appellant failed to state a specific objection based on Rule 404(b), and no such basis of objection could be considered clear from the context," review was for plain error only)
 
 
 [22]
 Archer objected to the reference to Williams and the earlier narcotics arrest on the grounds of both relevancy and collateral bad acts. This was the only time "collateral bad acts" was mentioned; the objection was not spelled out then, nor was it mentioned later when counsel elaborated on its relevancy objection or when it moved to strike on relevancy grounds all evidence relating to the July 24th incident (not merely the reference to Williams). In these circumstances, Archer did not preserve a collateral bad acts objection to all evidence relating to the July 24th incident. Archer does not, in fact, argue that anything other than a relevancy objection was preserved
 
 
 [23]
 Rule 404(b) provides:
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....
 The rule also requires the government to provide reasonable notice of its intent to introduce the evidence; Archer does not argue that this part of the rule was violated.
 
 
 [24]
 The first sample was one page, on which Hubbard had signed his name once and written seven words and a series of numbers (1 to 9 or 10) about seven times each
 
 
 [25]
 The following stipulation was read to the jury:
 The Defendant Charles Hubbard was ordered by this Court on August 20, 1992, to provide handwriting exemplars or samples to the Government for comparison purposes.
 The Defendant Hubbard provided the handwriting exemplars contained in Government's Exhibit 200. After the Defendant Hubbard provided those exemplars, additional exemplars were requested because those provided were insufficient to make a conclusive comparison with questioned writings.
 The Court ordered Defendant Hubbard to provide the additional handwriting exemplars. The Defendant Hubbard refused to obey this order and provided no additional exemplars.
 
 
 [26]
 The jury was instructed:
 There is evidence that the Defendants McNealy, Jefferson and Hubbard failed and refused to obey an order of this Court, specifically that they each furnish a specimen of their handwriting for identification purposes. The Court's orders were lawful and did not violate any Defendant's privilege against self incrimination since it did not require the Defendants to give testimony. The refusal to obey the order is not sufficient to show guilt of the offense charged. An innocent person held to answer charges may adopt various strategies, proper or improper, to avoid identification and prosecution. You may consider the Defendants' failure and refusal to obey a lawful order of the Court, however, and may give it such weight as you think it is entitled to as tending to prove consciousness of guilt.
 
 
 [27]
 Hubbard called U.S. Marshal Davis who testified to his understanding that no one else heard the alleged threat and that an inquiry into the incident had yielded negative results
 
 
 [28]
 See also Bell v. Evatt, 72 F.3d 421, 433 (4th Cir.1995) (trial judge's prevention of ingress and egress to courtroom during witness testimony did not violate public-trial right where "trial judge was merely maintaining order in his courtroom and ensuring a non-disruptive atmosphere" for participants, press, and public; no one was ordered to leave; no portion of trial was completely closed to public; and "record does not reveal that anyone interested in the case was excluded from the courtroom[ ]"), cert. denied, --- U.S. ----, 116 S.Ct. 2533, 135 L.Ed.2d 1056 (1996); Woods v. Kuhlmann, 977 F.2d 74, 77-78 (2d Cir.1992) (trial court's exclusion of defendant's family members from courtroom during testimony of government witness did not violate public-trial right, where family members had approached witness outside courtroom and made her apprehensive about testifying)
 
 
 [29]
 The prosecution stated that Hubbard had told two marshals who were escorting him from the courtroom to the lock-up that "when I get out of here, I'm going to take some of these white crackers with me and some of them are right here in this room. I've got nothing to lose." On an earlier occasion, Hubbard threatened another deputy marshal if he handled him
 
 
 [30]
 Other parts of the record indicate that the external matter giving the court concern was the anticipated handing down of a jury verdict in the Rodney King trial in federal court in Los Angeles. That trial (which followed the acquittals of the police officers in state court which resulted in days of rioting) commenced a few weeks after this one, in late February 1993; the jury reached a verdict on April 16, 1993 and announced it on April 17. The instant trial in Tampa also had received publicity and involved black defendants accused of serious drug offenses for which they could receive life sentences (and did). While deliberations in the King case continued, the district court required jurors to remain in the jury room for lunch and gave a cautionary instruction that if a verdict were returned in another case in another city and there were some local reaction, that was not to affect their judgment of the evidence presented here
 
 
 [31]
 The judge noted:
 We've got video cameras all over this place. [The jury's had] monitors and everything else. They just think it's coming attractions. I'm not going to worry about a camera being here.
 The judge stated that she would explain the cloths covering the tables to the defendants, but not the jurors.
 
 
 [32]
 The average weight of a 50-pack, based on lab reports from sixteen instances in which packs were seized from March through August 1991, was determined to be 12.61 grams. The government used a slightly more conservative estimate for purposes of total quantity calculations
 
 
 [33]
 The product, 1312.5 grams, was rounded down to 1300 grams, as were the quantities in grams sold at the other locations
 
 
 [34]
 The prosecution told the district court that witnesses had collectively reported seeing the three defendants make deliveries to Mathis or others associated with him at least 42 times. Sometimes the witnesses saw that the paper bags contained crack cocaine, sometimes they did not, and on none of these occasions was a specific quantity of crack cocaine established. Presumably for these reasons, the prosecution represented that it was not relying on this evidence to establish drug quantity, yet it repeatedly reminded the court of the evidence as support for the view that its estimates were fair, accurate, and conservative. The record indicates that the court took into account this evidence when it accepted the government's figures
 
 
 [35]
 See, e.g., United States v. Butler, 41 F.3d 1435, 1447 (11th Cir.) (review of the record did not reveal "sufficient circumstantial or direct evidence that January 17 was a reliable proxy for all of the other days in the conspiracy[ ]"), cert. denied, --- U.S. ----, 115 S.Ct. 1987, 131 L.Ed.2d 874 (1995); United States v. Sepulveda, 15 F.3d 1161, 1199 (1st Cir.1993) ("the gap in proof is not satisfied by showing ... that more trips and larger amounts are consistent with the general scale of the [drug leader's] enterprise[ ]"), cert. denied, 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); United States v. Garcia, 994 F.2d 1499, 1509 (10th Cir.1993) (averages used to arrive at drug quantity findings must be "more than a guess")
 
 
 [36]
 See U.S.S.G. §§ 2D1.1(c), 5A (Nov. 1, 1992). For the conspiracy to distribute drugs count on which all defendants were convicted, the mandatory term was ten years to life imprisonment. See 21 U.S.C. § 841(b)(1)(A)
 
 
 [37]
 She received a base offense level of 42 corresponding to an amount of crack cocaine in excess of 15 kilograms, and a two-level increase for possession of a firearm during the drug conspiracy. See U.S.S.G. § 2D1.1(b)(1); United States v. Otero, 890 F.2d 366, 367 (11th Cir.1989) (per curiam) (discussing conditions for attributing to one conspirator a coconspirator's possession of a firearm)
 
 
 [38]
 The record shows that the day after McKinnon testified at her sentencing hearing, the prosecution called Detective McConaughey, who testified that he had spoken the previous evening with two witnesses who allegedly told McKinnon that they lied at trial, and they stood by their testimony and denied that they had spoken with her or through anyone else about it. He did not know whether either one had communicated by writing with McKinnon
 
 
 [39]
 Application note 5 reads:
 Defendant O knows about her boyfriend's ongoing drug-trafficking activity, but agrees to participate on only one occasion by making a delivery for him at his request when he was ill. Defendant O is accountable under subsection (a)(1)(A) for the drug quantity on that one occasion. Defendant O is not accountable for the other drug sales made by her boyfriend because those sales were not in furtherance of her jointly undertaken criminal activity (i.e., the one delivery).
 
 
 [40]
 See United States v. Lee, 68 F.3d 1267, 1276 (11th Cir.1995) (where district court's decision on quantity of drugs attributable to conspirator was based on testimony at trial which it conducted, "we give great deference to the district court's assessment of the credibility and evidentiary content of [the witnesses'] testimony[ ]")
 
 
 [41]
 Brazel's base offense level was 42, based on an attributable quantity of more than 15 kilograms of cocaine base (169.5 kilograms). He received a two-level increase for possession of a firearm in connection with the conspiracy, and a three-level increase for his leadership role (an overseer) in the offense. His total offense level was 47 and criminal history category was III
 
 
 [42]
 This section provides for a two-level increase "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense."